UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

HUBBARD PROPERTIES, INC.

Debtor.

_____/

Chapter 11

Case No: 8:11-bk-1274-KRM

**DEBTOR'S RESPONSE IN OPPOSITION TO INVESTORS WARRANTY OF AMERICA, INC.'S MOTION FOR DETERMINATION THAT DEBTOR'S CASE IS A "SINGLE ASSET REAL ESTATE" CASE**

HUBBARD PROPERTIES, INC. (the "Debtor"), by counsel, hereby files its response in opposition (this "Response")[1] to the *Motion of Investors Warranty of America, Inc. for Determination That Debtor is a Single Asset Real Estate Case* (Doc. No. 13) (the "Motion") and states as follows:

**SUMMARY OF THE ARGUMENT**

1. Through its Motion, IWA (an investment vehicle of an insurance conglomerate based in the Netherlands) incorrectly alleges that this Court should treat this bankruptcy as a "single asset real estate" case pursuant to Section 101(51B) and related provisions of the Bankruptcy Code (the "SARE Provisions"). In a transparent attempt to gain a tactical advantage by shackling the Debtor with the burdens of Section 362(d)(3) of the Bankruptcy Code, IWA urges this Court to find that this Debtor owns

---

[1] Because the Motion was set for hearing on relatively short notice, the Debtor believes it is necessary to promptly file this Response. However, this Response is being filed without waiver or prejudice to the Debtor's ability to assert that Investors Warranty of America, Inc. ("IWA") should be required to seek the declaratory relief requested in its Motion by commencing an adversary proceeding thereby affording both parties the procedural safeguards contemplated by the applicable rules governing the discovery and litigation processes in adversary proceedings.

"single asset real estate" by blatantly ignoring the myriad of revenue-generating business activities conducted by the Debtor on its marina property in Madeira Beach, Florida (the "Property").

2. Contrary to IWA's assertions, the Debtor is not subject to the SARE Provisions of the Bankruptcy Code because (i) the Property, with five separate buildings, a marina, public parking facilities, retail shops, restaurants, and other amenities does not constitute "a single property or project";[2] (ii) the Property is a tourist destination, and the Debtor (and its affiliates) actively conduct substantial and varied business activities on the Property, each of which is in addition to the business of "operating the real property and activities incidental"; and (iii) the Debtor has historically received (and in some cases continues to receive) substantial gross revenues from sources other than just passively collecting rental income related to the Property.

## BACKGROUND

3. On January 27, 2010, (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

4. The Debtor continues to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. No trustee or examiner has been appointed.

6. The Debtor is a Florida company that owns and operates on the Property a retail and entertainment complex commonly known as the John's Pass Boardwalk. The

---

[2] The Debtor notes that IWA has not alleged that the Property is a single property or project. Accordingly, the Debtor believes IWA has conceded the first element articulated by Section 101(51B) but will still address why the Property is not a single property or project in this Response.

Property is a vibrant destination for visitors to the area that is promoted by the City of Madeira Beach and the Tampa Bay Beaches Chamber of Commerce.

7. The Property consists of approximately 39,862 square feet of retail and restaurant space located in five buildings, a marina facility with boat docks, a 322-car parking garage, and related amenities. A pictorial overview of the Property is attached as **Exhibit "A"** to this Response.

8. The Hubbard family has owned and operated the Property and related businesses, including a marina and the Friendly Fisherman Restaurant, since 1976.

9. Over the years, a good portion of the Debtor's facilities have been leased to a variety of businesses. Various portions of the Property are currently leased to (i) Happy Feet, USA; (ii) Florida Fisherman, Inc. and the Friendly Fisherman Restaurant, Inc.; (iii) Caribongo, LLC; (iv) Butterfield Bros., LLC d/b/a Kilwin's of John's Pass; (v) Natural Comfort Footwear, Inc. d/b/a Florida Footwear; (vi) Denim Enterprises; (vii) Myorleans, LLC d/b/a Addicted to the Bean; (viii) Nagasti, Inc. d/b/a Gray Jewelers; (ix) Hooter's of John's Pass;[3] and (x) Bubba Gump Shrimp Co. Restaurants, Inc., (collectively, the "Tenants").

10. In addition to generating income by leasing space to various retail, charter boat, and restaurant tenants, the Debtor and its affiliated business have historically generated substantial revenues from their own business activities on the Property,

---

[3] The Hooter's location is currently is currently in the final stages of a build-out with an anticipated opening date in early February 2011.

including income from its parking business, from marina management services provided to gambling cruise boats, and a property management and marketing business.

11. Between August 2004 and October 2007, Bank of America extended a series of loans to the Debtor which is allegedly secured by, among other things, a mortgage on the Property (collectively, the "Loan"). The proceeds of the Loan were used to construct improvements to the Property. The Loan was apparently assigned by Bank of America to Transamerica Financial Life Insurance Company ("Transamerica") in October 2007. Transamerica in turn assigned the Loan to IWA around June 2009.

12. Since acquiring the Loan, IWA has exercised an unusually aggressive level of involvement and control over the Property and over the Debtor's business operations on the Property. In addition to improperly assuming almost total control over collection of the Debtor's revenues and payment of its expenses, IWA also imposed operational control over the Debtor's business activities (which included forcing the Debtor to shut down and dismantle its sixteen (16) person management and marketing business in February of 2009).[4]

## ARGUMENT

13. This case clearly does not involve "single asset real estate," and thus does not implicate the SARE Provisions.

---

[4] It is glaringly ironic that IWA is alleging that the Debtor does not currently conduct multiple business activities on the Property. It was actually IWA (unjustifiably acting as a "mortgagee-in-possession") that forced the Debtor to terminate operations of what was its thriving management and marketing business. IWA should be estopped from advancing this inequitable position, as discussed below.

14.     The conjunctive provisions of Section 101(51B) define "single asset real estate" as (i) real property constituting a single property or project, other than residential real property with fewer than four residential units, (ii) which generates substantially all of the gross income of a debtor who is not a family farmer, *and* (iii) on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto.

15.     Here, *none* of Section 101(51B)'s requirements are met. The Property is not a "single asset real estate" because it is not a single property or project, substantial and varied business activities are conducted by the Debtor, and the Debtor receives a substantial amount of its gross revenues from its business activities other than solely the passive collection of revenue from its Tenants.

16.     Moreover, the Debtor does not fit the mold of the typical "SARE debtor" that is contemplated in the legislative history underlying Section 101(51B). There, one finds that the "SARE debtor" targeted by the SARE Provisions is characterized as an entity that owns a single piece of undeveloped land, acquired using a purchase money mortgage from the primary secured lender, with a dearth of other creditors. *See Centofant v. CBJ Dev.,* 202 B.R. 467, 472 n. 7 (B.A.P. 9th Cir. 1996).

17.     To the contrary, in this case (1) this Debtor operates several active business enterprises on its Property that generate a substantial amount of revenue, in addition to leasing and managing substantial space to retail and restaurant tenants; (2) the Loan was intended to fund improvements, and is not the type of purchase money mortgage involved in typical SARE bankruptcy cases; and (3) unlike the cases centered around a two-party

dispute that the SARE Provisions are designed to address, IWA is not the Debtor's sole creditor—in fact, the Debtor has significant creditor body comprised of approximately $1,700,000.00 of unsecured debt held by over thirty (30) other creditors.

18. It appears the IWA has elected to utterly ignore these irrefutable facts to advance its argument that the SARE Provisions should apply to this case. Of course, the thinly veiled reason for IWA's tactic is clear: it hopes to force the Debtor to either (1) file a plan within the truncated timeframe mandated by Section 362(d)(3)(A), or (2) force the Debtor to pay IWA interest at the applicable non-default interest rate mandated by Section 362(d)(3)(B). Because this is not a case involving "single asset real estate," neither requirement is mandated by the Bankruptcy Code, and would unfairly prejudice the Debtor.

### i. **The Property is neither "a single property" nor "a single project."**

19. Clearly, the Property does not constitute a "single property," as it indisputable that the Property encompasses more than one tract of land.

20. Several of the parcels have separate legal descriptions, and the buildings located on the parcels were not constructed during the same time periods. Moreover, the parcels are clearly separate properties, as a public road divides the parcels, and the land in between the parcels is owned by third parties.

21. Additionally, the Tenants' addresses reveal that the parcels are not contiguous and in fact, span several blocks. For example, Hubbard's Marina and the Friendly Fisherman restaurant are located at 150 Johns Pass Boardwalk W., while Kilwin's is located at 160 Johns Pass Boardwalk W., Gray's Jewelers is located at 172 Johns Pass Boardwalk W. Caribongo is located several blocks away at 180 Johns Pass

Boardwalk W., and Florida Footwear is located at 206 Johns Pass Boardwalk W. Bubba Gump Shrimp is located on a different street, at 185 Boardwalk Place W.

22. Further, the Property is not a "single project" because it is a diverse, vibrant visitor destination that, as a business model, must offer a wide variety of activities and amenities on the Property for its many guests.

23. In considering whether multiple parcels are a single project, courts have evaluated whether the properties share a common physical border, but also focus their analysis on whether the properties are "linked together in some fashion in a common scheme involving their use." *In re The McGreals*, 201 B.R. 736, 742-43 (Bankr.E.D. Pa. 1996); *In re Philmont Dev. Co.*, 181 B.R. 220 (Bankr. E.D. Pa. 1995).[5]

24. Although the John's Pass Boardwalk area is collectively a tourist destination, it cannot be said that the Property has common scheme for use, as could be said for a simple apartment complex. *See*, *Centofant v. CBJ Dev.*, 202 B.R. 467, 472 n. 7 (B.A.P. 9th Cir. 1996) (operation of a an apartment complex is insufficient to remove the building from the definition of SARE, while a full service hotel with a gift shop, restaurant, and bar is likely not a SARE).

---

[5] The *McGreals* Court offered a hypothetical with facts remarkably similar to this case to illustrate the differences between situations where multiple properties constitute a single project and where the properties are not a single project. 201 B.R. 736, 742-43, n. 8. According to the Court's hypothetical, if a debtor owned two non-contiguous parcels of real property, and rented a building to tenants on one parcel and used the other parcel for a parking lot exclusively for the tenants' use, such use of the parcels would constitute a single project. *Id.* But, if the debtor operated the parking lot as a stand alone business to service general parking needs of the area or leased the parking lot to a third party to operate, the parcels would not constitute a single project. *Id.* The *McGreals* Court also noted that a common border would not cause the parcels to be considered a single project. *Id.* The Debtor's use of the parcels is consistent with the *McGreals* Court's characterization of real property that is not considered a single project under section 101(51B), as the Debtor operates a parking lot for the general use of visitors to the John's Pass Boardwalk, leases the buildings to different entities which operate a variety of businesses on the premises, and has a portion of the Property geared towards marina based business activities.

25. Instead, the Debtor operates a parking lot that is used for public parking, employee parking, overnight parking for cruises and charter boat customers, and patron parking on one parcel of the Property. On other parcels, the Debtor leases its buildings to tenants who operate diverse restaurant and retail businesses. On another portion of the Property (which is used in conjunction with the Debtor's submerged land lease) exists a busy marina that supports charter boat operations and boat slip rentals. At times, some sections the Debtor's property are used as venues for seafood festivals, art festivals, and similar community-wide activities. Yet another area of the Debtor's Property was formerly used to support a gambling cruise business, and the Debtor is hopeful that it can use the Property for a similar type of operation in the future.

26. With the wide spectrum of activities conducted on the Property, including for restaurants, stores, charter boat tours, boat slip rentals, festivals, gambling cruises, parking facilities, and other diverse uses, the Property cannot reasonably be said to be a "single project" that has a common scheme for use.

      **ii.** **The Debtor, especially when considering its affiliated businesses, conducts substantial business other than just operating the Property and "activities incidental."**

27. This Debtor has always done much more as a business than just passively collect rent checks and engage in simple property management. The Debtor actively works to generate income from the Property.[6]

---

[6] Importantly, the Debtor is not designated as a "single asset real estate" entity for tax purposes, as its income derived from operating the parking lot and billing each tenant for its share of utility usage is not considered passive income under the Internal Revenue Code or reported on Form 8825. The Debtor has no incentive or ulterior motive to characterize the income as "active." In fact, the Debtor is actually disadvantaged from a tax perspective by characterizing the parking lot and utility income as active income, as the active income cannot be used to setoff any passive losses generated from the Property.

28. Courts have applied an active-versus-passive criterion to determine whether a debtor is engaged substantial business other than operating the real property. *Ad Hoc Group of Timber Noteholders v. Pacific Lumber Co. (In re Scotia Pacific Co., LLC)*, 508 F.3d 214, 218 (5th Cir. 2007). If the revenue is the product of active labor and effort, courts typically find that the debtor is engaged in substantial other business, but if the revenue is received as investment income by the property owner, the debtor is not engaged in substantial other business. *Id.* Real property that requires employment of workers and managers in addition to the principals of the debtor is excluded from the definition of SARE. *Id.*

29. Clearly, the SARE Provisions only apply to a limited subset of debtors who are passive real estate investment vehicles, and generally do not apply if the debtor performs legitimate business activities on the real property. Courts have distinguished the operation of an apartment complex from a full service hotel, marina, or golf course, finding that the former constitutes single asset real estate, while the latter is excluded from the definition. See *Centofant v. CBJ Dev.*, 202 B.R. at n. 7 (operation of a an apartment complex is insufficient to remove the building from the definition of SARE, while a full service hotel with a gift shop, restaurant, and bar is likely not a SARE); *In re Club Golf Partners, L.P.*, 2007 WL117010, at *2 (E.D. Tex., Apr. 20, 2007) (golf course is not SARE); *In re Whispering Pines Estate, Inc.*, 341 B.R. 134, 135 (Bankr. D.N.H. 2006); *In re Prairie Hills Golf & Ski Club*, 225 B.R. 228 (Bankr. D. Neb. 2000) (debtor not single asset real estate where builds and sells residences, constructs roads to residences, leases ski area to third party, and sells liquor in clubhouse); *In re Kkemko*

*Inc.*, 181 B.R. 47 (Bankr. S.D. Ohio 1995) (marina which sold fuel and provisions, provided boat storage, and offered boat repair was not SARE).

30. Here, the Debtor actively provides managed parking services and facilities to the general public as well as patrons and employees of the businesses on the Property. This parking business is a complex operation that uses the services of roughly ten (10) workers to collect of parking revenue, process payroll to parking service personnel, maintain the parking garage and related facilities, monitor the Debtor's parking meters, issue tickets and enforce parking violations, and provide related services. In fact, the Debtor's parking business is so complicated that the Debtor formerly used a portion of its own sixteen (16) person management business to operate it. However, as mentioned earlier, IWA has forced the Debtor to terminate that management business and instead use the services of an outsourced parking and facilities management company.

31. It is worth noting that the Debtor's former management and marketing business, was shut down at IWA's insistence.[7] Admittedly, this aspect of the Debtor's operations was responsible for providing janitorial services and complex accounting services for tenants on the Property with shared utility and other expenses, and maintaining the infrastructure on the Property. Importantly, however, this management arm of the Debtor also operated the parking business on the Property and was heavily engaged in marketing, advertising, and public relations that benefited the entire John's

---

[7] It should be noted that to the extent the Debtor's business activities have been outsourced to a property management company at IWA's direction, it would be inequitable to prejudice the Debtor to IWA's benefit by imposing the SARE Provisions. IWA should be estopped from arguing that it is entitled to additional protections provided to creditors in SARE cases under section 362(d)(3), when it is the cause of the Debtor's diminished business activities.

Pass Boardwalk area. Although at IWA's insistence the Debtor was forced to fire most of the sixteen (16) employees that worked in its management and marketing business, the fact that (even now) this segment of the Debtor's business requires the employment of dozens of workers proves that this Debtor is engaged in "substantial other business," and that SARE Provisions do not apply in this case.

32. Another aspect of the Debtor's business enterprise relates to providing dock space and dock services for commercial cruise operators. Previously, the Debtor directly provided docking and dock services to "SunCruz" casino ships. Unfortunately, this business (which provided approximately $50,000 per month in gross revenues to the Debtor) ceased operations in 2009. Since then, the Debtor has endeavored to find another similar maritime operator that could make use of this aspect of the Debtor's business and its available docking facilities, and is currently in active negotiations with two such parties. This aspect of the Debtor's operations could have never existed if the Debtor is a company whose sole activity is passively collecting rental income.

33. Additionally, the Debtor's affiliates conduct substantial business operations at the Property. Friendly Fisherman Restaurant, LLC ("<u>Friendly Fisherman</u>"), operates a restaurant at the Property, while Florida Fisherman, Inc. ("<u>Florida Fisherman</u>")[8] which operates a portion of the marina, including a charter boat center, tour boat services, and a tackle and souvenir store. The Debtor's continued operation is essential to the continued viability and sustainability of its affiliates, as the Debtor, together with the affiliates, are interrelated. Notably, the Debtor's affiliates also have a

---

[8] As the Court likely recalls, Florida Fisherman was a chapter 11 debtor in Case No. 8:10-bk-19926. The Florida Fisherman's plan of reorganization was recently confirmed by this Court.

{00147919.DOC;1} 11

substantial number of employees, including but not limited to a waitstaff and boat captains.

34. Clearly, the business operations of the Debtor are more akin to the hotel, marina, and golf course than they are to a simple apartment complex. This analogy is even more potent when one considers the business activities of the Debtor's affiliates. Given size, number, nature, and complexity of the Debtor's business activities, the SARE Provisions simply do not apply in this case.

> **iii. The Debtor's substantial business activities, excluding passive collection of rental income, generate a substantial portion of the Debtor's gross revenues.**

35. The aforementioned substantial business activities of the Debtor generate a material amount of gross revenues, in addition to the rents paid by tenants on the Property.

36. Most significantly, perhaps, is that the Debtor's parking business last year generated approximately $400,000 in gross revenue—which equals about one-third of the Debtor's total gross revenues (including its rental income) for the year.

37. It is also worth reiterating that when the Debtor operated its marina services business for the SunCruz casino boats, the Debtor received gross revenues from that business activity of almost $50,000 per month. As mentioned previously, the Debtor is actively pursuing that aspect of its business, in an effort to reinitiate that revenue stream.

38. Lastly, the Debtor formerly ran its management and marketing business, which generated some additional revenue for the Debtor and provided jobs to its

employees. The Debtor would still have this aspect of its business as a source of revenues had IWA not effectively dismantled it.

## CONCLUSION

39. For the SARE Provisions to apply in this case, ***all*** of the conjunctive elements of Section 101(51B)'s would have to be satisfied. To the contrary, based on the facts and reasoning set forth above, this Court can quickly conclude that ***none*** of those elements are satisfied and that the SARE Provisions therefore do not apply to this Debtor.

**WHEREFORE**, the Debtor respectfully requests the entry of an order (i) denying the Motion in all respects, (ii) or, at a minimum, deferring the determination of whether the Debtor is subject to the SARE provisions and extending any applicable period under section 362(d)(3), and for such other relief as is just.

DATED this 14th day of February, 2011.

        */s/ Kathleen L. DiSanto*
        Chad S. Bowen
        Florida Bar No. 0138290
        Kathleen L. DiSanto
        Florida Bar No. 58512
        **Jennis & Bowen, P.L.**
        400 N. Ashley Dr., Ste. 2540
        Tampa, FL 33602
        Telephone: (813) 229-1700
        Facsimile: (813) 229-1707
        Email: kdisanto@jennisbowen.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished, by facsimile, electronic service and/or U.S. Mail, postage prepaid to **Investors Warranty of America, Inc.**, c/o its Registered Agent, C T Corporation System, 1200 S. Pine Island Rd., Plantation, FL 33324, and its counsel **Keith Fendrick**, Holland & Knight, LLP, 100 N. Tampa Street, Suite 4100, Tampa, FL 33602, and **United States Trustee**, 501 E. Polk St., Ste. 1200, Tampa, FL 33602 and any parties receiving CM/ECF service on this 14th day of February, 2011.

                                                */s/ Kathleen L. DiSanto*
                                                Kathleen L. DiSanto

EXHIBIT "A"

