# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

In re:

HUBBARD PROPERTIES, LLC,

          Debtor.

_____/

Chapter 11

Case No: 8:11-bk-1274-KRM

## DEBTOR'S MOTION FOR AUTHORITY TO ENTER INTO MANAGEMENT AGREEMENTS OR ALTERNATIVELY APPLICATION FOR ORDER AUTHORIZING EMPLOYMENT OF FAMECO MANAGEMENT SERVICES ASSOCIATES, L.P. AND THE SHOPPING CENTER GROUP, LLC AS PROPERTY MANAGER

Hubbard Properties, LLC ("Hubbard" or the "Debtor"), by counsel, and pursuant to Section 363 of title 11 of the United States Code (the "Bankruptcy Code"), seeks the entry of an order authorizing the Debtor to enter into management agreements with Fameco Management Services Associates, L.P. ("Fameco") and The Shopping Center Group, LLC ("SCG"). To the extent Fameco and/or SCG are determined to be professionals under Section 327 of the Bankruptcy Code, the Debtor seeks authority to employ Fameco and/or SCG pursuant to Sections 327(a) and 328 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure. In support, the Debtor states as follows:

### Background

1.     On January 27, 2011 (the "Petition Date"), the Debtor filed its Voluntary Petition for Relief under chapter 11 of the Bankruptcy Code.

2. The Debtor is continuing in possession of its property and operating and managing its property as Debtor-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3. On May 11, 2011, the United States Trustee for the Middle District of Florida appointed the Official Committee of Unsecured Creditors (the "Committee"), pursuant to Section 1102 of the Bankruptcy Code.

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b). No previous application to retain SCG has been made by the Debtor to this Court or any other court.

5. The Debtor is a Florida limited liability company that owns and operates a retail and entertainment complex located in Madeira Beach, Florida, commonly known as the John's Pass Boardwalk (the "Property"). The Property consists of approximately 39,862 square feet of retail space located in five buildings and a 322-car parking garage. Portions of the Property are currently leased to (i) Happy Feet, USA,; (ii) Florida Fisherman, Inc.; (iii) Caribongo, LLC; (iv) Butterfield Bros., LLC d/b/a Kilwin's of John's Pass; (v) Natural Comfort Footwear, Inc. d/b/a Florida Footwear; (vi) Denim Enterprises; (vii) Myorleans, LLC d/b/a Addicted to the Bean; (viii) Friendly Fisherman Restaurant; (ix) Nagasti, Inc. d/b/a Gray Jewelers; (x) Hooter's of John's Pass; (xi) Bubba Gump Shrimp Co. Restaurants, Inc.; (xii) Florida Paw Paws, Inc.; and (xiii) the Pier Aquarium, Inc., d/b/a Marine Discovery Center (collectively, the "Tenants").

6. On February 16, 2011, the Debtor filed *Debtor's Motion for Authority to Assume Management Agreement or Alternatively Application for Order Authorizing Employment of*

*Grubb & Ellis as Property Manager* (Doc. No. 41) (the "<u>G&E Application</u>") seeking the authority to assume a management agreement with the Debtor's current property manager Grubb & Ellis ("<u>G&E</u>") pursuant to Section 365 of the Bankruptcy Code or alternatively authorizing the employment of G&E pursuant to Section 327 of the Bankruptcy Code.

7.     Following multiple hearings on the G&E Application, and based on concerns raised by the Court and the U.S. Trustee regarding G&E's disinterestedness,[1] together with G&E's inability to provide an acceptable declaration of disinterestedness, the Debtor withdrew the G&E Application, without prejudice.

<div align="center">

**<u>Relief Requested and Basis for Relief</u>**

</div>

8.     While arguably employment of a property manager is in the ordinary course of business for the Debtor and Section 363(c) would allow the Debtor to employ Fameco and SCG without notice or a hearing, in an abundance of caution, the Debtor seeks an order of this Court authorizing the Debtor to enter into a management agreement with Fameco (the "<u>Fameco Agreement</u>") and a management agreement with SCG (the "<u>SCG Agreement</u>") pursuant to Section 327 of the Bankruptcy Code.  A copy of the Fameco Agreement is attached as **Exhibit "A"** and incorporated by reference; a copy of the SCG Agreement is attached as **Exhibit "B"** and incorporated by reference.  Alternatively, to the extent that Fameco and/or SCG are determined to be "professionals" as contemplated by Section 327 of the Bankruptcy Code, the Debtor seeks authority to employ Fameco and/or SCG under the terms and conditions of the Fameco Agreement and/or the SCG Agreement.

---

[1] G&E has provided, or currently provides, property management services for properties in which the Debtor's major secured creditor, Investors Warranty of America or its affiliate and agent, AEGON, may have some interest as owner or lender.

9.      Hubbard requires the services of a property manager with significant experience in both the managing and overseeing of the assets of a sophisticated retail complex and managing tenant relations and interacting with third-party vendors and contractors.

10.     Fameco has significant experience in assisting management and property management and will provide assistance to the Debtor in the management of the Property, the development and review of financial projections and identifying operational efficiencies on an ongoing basis.

11.     SCG has significant experience in the day-to-day operations of retail complexes and will collect rents from the Tenants, oversee repairs and maintenance of the Property, and prepare and maintain basic business records relating to the Property.

12.     Pursuant to the Fameco Agreement, Fameco will receive compensation as follows:

     a.      Monthly asset management fee of the greater of $1,500.00 or 1.25% of gross receipts;

     b.      $2,000.00 per day plus travel expenses at cost (expected to be 2 days) for initial site visit; and

     c.      $225.00 per hour (to be capped at $5,000.00) for review of financial projections, preparation of a budget and cash flow forecast.

13.     Pursuant to the SCG Agreement, SCG will receive compensation as follows:

     a.      Monthly management fee equal to 3.75% of gross receipts;

     b.      Fee for supervision of capital improvements, repairs and replacements, and landlord's work equal to 5% of the construction cost, in the event there is a general

contractor. If there is no general contractor, the fee shall be 10%.

        c.        Fee for supervision of tenant improvements, where Debtor is providing a tenant improvement allowance, an amount equal to the greater of $750.00 or 5% of the total cost of the improvement; a fee of $750.00 for tenant improvements where there is no tenant improvement allowance; and a fee of $1,500.00 for tenant improvement requiring extensive interior and exterior upfit or construction where there is no tenant improvement allowance.

14.        Fameco and SCG's assistance developing financial and operational projections, identifying efficiencies, and interacting with Tenants and third-party contractors is necessary to the Debtor and the ongoing operations of the Property. Further, the contemplated fees to be paid to Fameco and/or SCG are reasonable.

15.        A declaration of disinterestedness by Fameco (the "<u>Fameco Declaration</u>"), as required by Section 327(a) and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, is attached as **Exhibit "C"** to this Application in support of this Application.

16.        A declaration of disinterestedness by SCG (the "<u>SCG Declaration</u>"), as required by Section 327(a) and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, is attached as **Exhibit "D"** to this Application in support of this Application.

17.        Except as may be otherwise set forth in this Application and the Fameco Declaration or the SCG Declaration, neither Fameco nor SCG holds or represents any interest adverse to the Debtor or its estate.

18.     The Debtor believes Fameco's and/or SCG's employment would be in the best interest of the estate and, accordingly, seeks to employ Fameco and/or SCG to render the services as outlined above under the terms and conditions described herein.

**WHEREFORE**, the Debtor respectfully requests the entry of an order authorizing the Debtor to enter into the Fameco Agreement and/or SCG Agreement with Fameco and/or SCG or alternatively authorizing the employment of Fameco and/or SCG as property manager for the Debtor for the purposes described above and for such other and further relief as the Court may deem appropriate.

Dated this 9th of September 2011.

_/s/ David S. Jennis_
David S. Jennis
Florida Bar No. 775940
James-Allen McPheeters
Florida Bar No. 65434
**Jennis & Bowen, P.L.**
400 N. Ashley Dr., Ste. 2540
Tampa, FL 33602
Telephone: (813) 229-1700
Facsimile: (813) 229-1707
djennis@jennisbowen.com
jmcpheeters@jennisbowen.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished, by facsimile, electronic service and/or U.S. Mail, postage prepaid to **Lawrence R. Zipf**, Fameco Management Services Associates, L.P., 633 West Germantown Pike, Suite 200, Plymouth Meeting, PA 19462; **John Sebring**, The Shopping Center Group, LLC, 300 Galleria Parkway, 12th Floor, Atlanta, GA 30339; **Keith Fendrick**, Holland & Knight, LLP, 100 N. Tampa Street, Suite 4100, Tampa, FL 33602; **Patrick Mosley**, Counsel for the Committee of Unsecured Creditors, Hill, Ward & Henderson, P.A., 101 E. Kennedy Blvd., Suite 3700, Tampa, FL 33602; and **United States Trustee**, 501 E. Polk St., Ste. 1200, Tampa, FL 33602 and to those parties who receive electronic notices via CM/ECF in the ordinary course of business on this 9th day of September 2011.

*/s/ David S. Jennis*
David S. Jennis

## ASSET MANAGEMENT AGREEMENT

This Asset Management Agreement (the "Agreement") made this _____ ___, 2011 by and between **Hubbard Properties, LLC** ("**Owner**") and **FAMECO Management Services Associates, L.P., a Pennsylvania limited partnership**, having its principal office at **633 West Germantown Pike, Suite 200, Plymouth Meeting, PA 19462** (the "**Asset Manager**").

## 1.      APPOINTMENT OF ASSET MANAGER

### 1.1     APPOINTMENT AND ACCEPTANCE

The Owner hereby appoints Asset Manager of the Premises (as defined below) upon the terms and conditions provided herein. Asset Manager accepts the appointment and agrees to furnish the services of its organization for the asset management of the Premises, and Owner agrees to pay all expenses in connection with those services.

### 1.2     DESCRIPTION OF PREMISES

That certain real property and improvements located in Madeira Beach, Florida known as Hubbard Properties, LLC **, Madeira Beach, Florida** (the "**Premises**").

### 1.3     TERM

The term of this Agreement shall be for an initial period of one (1) year (the "**Initial Term**") from approximately the 1st day of September, 2011 ("the Commencement Date") and thereafter shall be automatically renewed from year to year unless terminated as provided in Section 6 herein.

### 1.4     PROPERTY MANAGER

The Owner has entered into a Property Management Agreement (the "**Property Management Agreement**") with The Shopping Center Group to provide for the orderly management of the Property.

### 1.5     Intentionally Deleted

### 1.6     Other

**(a)      Intentionally Deleted**

**(b)      Leasing.**  The Asset Manager will work with Owner / leasing agent and use its best efforts to obtain tenants for all leasable square footage of the Property and to renew leases as provided herein.  Leases, lease amendments and lease renewals (other than the exercise by tenants of lease extension options under the terms of their respective leases or as approved within the parameters of the Premises Annual Budget) must be approved by the Owner.  In addition, the Owner will grant to the Asset Manager a special power of attorney to execute Approved Leases.

**(c)      Administrative Authority.**  In addition to any other powers that it may have under and pursuant to the provisions of this Agreement, the Asset Manager is hereby specifically authorized and empowered to execute (i) any forms or documents required from time to time to be presented to and/or executed by owners of real property located in the State of Florida under the laws of the State of Florida or under the laws, rules or regulations of any other governmental entity having jurisdiction over the Owner or the Property, including without limitation, leases of the Property or any part thereof that have been approved by the Owner in accordance with this Section 1.6.

**2.      SERVICES TO BE PROVIDED BY THE ASSET MANAGER**.

**2.1      ASSET MANAGEMENT**.  The Asset Manager shall provide Asset Management Services (the "**Asset Management Services**") assigned to or made the responsibility of the Asset Manager as described in Schedules A and B attached hereto,

**2.2      RELATIONSHIP OF THE ASSET MANAGER TO OWNER.**  The relationship of the parties to this Agreement shall be that of Owner and Asset Manager, and all duties to be performed by Asset Manager under this Agreement shall be for and on behalf of the Owner, in Owner's name, and for Owner's account. In taking any action under this Agreement, Asset Manager shall be acting only as the Asset Manager for Owner, and nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement except that of Owner and Asset Manager. Neither party shall have the power to bind or obligate the other except as expressly set forth in this Agreement and except that Asset Manager is authorized to act with such additional authority and power as may be necessary to carry out the spirit and intent of this Agreement.

**3.      RIGHT TO SUBCONTRACT.**  The Asset Manager reserves the right, in its sole discretion and at its own expense, to engage subcontractors to provide some or all of the Asset Management Services.   The Asset Manager also reserves the right, on behalf of the Owner and at the expense of the Property, to engage and retain professional services to assist in the orderly management of the Property, including, but not limited to, legal and accounting services and opinions related to the sale of the Property;  provided, however, that the Asset Manager shall not enter into any contract on behalf of the Property or the Owner for professional services requiring payment without the prior written approval of the Owner.

**4.      EXCULPATION.**  The Owner has engaged the Property Manager to serve as their exclusive property manager pursuant to the Property Management Agreement.  The Asset Manager is not a party to the Property Management Agreement.  Therefore, the Owner hereby acknowledges and agrees that the Asset Manager shall not be responsible for any property management functions or other matters related to the Property.

**5.      COMPENSATION**.


**Initial Site Visit:        $2,000 per day plus travel expenses at cost (2 days = $4,000)**
- Site Visit
- Interview/meetings with Owner, Property Manager and Leasing Agent/Lender/Legal
- Tenant Meetings
- Review of historical data and project information

**One Time Start up Fee:**

- $225.00 per hour – capped at $5,000, with intent to review if additional time is needed to complete projections.
- Financial review
- Budget Preparation and cash flow forecast

**After Site Visit and One Time Start up fee:**

**Asset Management Fee.** As compensation for the services provided by Asset Manager under this Agreement (and exclusive of reimbursement of expenses to which Asset Manager is entitled hereunder and any charges payable to Asset Manager in accordance with Sections 3  hereof), Owner shall pay Asset Manager as follows:

The greater of **$1,500.00 or 1.25% of gross receipts ("Gross Receipts") per month** by the tenth (10th) day of the following calendar month for the duration of this Agreement. Payments due to Asset Manager for periods of less than a calendar month shall be prorated over the number of days for which

compensation is due. This fee may be reviewed from year-to-year as this agreement is renewed. Gross Receipts include only the "net" revenue associated with the parking garage (gross income less parking garage direct costs).

The Asset Management Fee and Costs shall be payable monthly in arrears out of the funds held by the Property Manager prior to making any distributions to the Owner.

In the event that the Premises are listed for sale during the period of this Agreement, and Asset Manager is requested to assist in the sale or due diligence process for any potential sale, Asset Manager shall be entitled to additional compensation equal to 0.5% of the selling price.

### 5.1    Costs

All direct costs associated with the project will be charged to the project at our actual cost, including travel and other customary expenses. Off-site administrative costs associated with supporting the project, including property specific overnight mail, postage, licensing fees, and similar items which are directly attributable to the management and oversight of the property, will be reimbursable to Asset Manager by the property, at Asset Manager's direct cost without mark up.

Except with respect to subcontractors engaged pursuant to Section 3, the Asset Manager shall be reimbursed for all of its out of pocket costs incurred in connection with providing the Asset Management Services (the "**Costs**").

### 5.2    Intentionally deleted.

**5.3    Agreement of the Property Manager.**  By executing this Agreement, the Property Manager agrees to pay the Asset Management Fee and Costs as and when provided in this Section 5 and to comply with the other terms and conditions set forth in this Agreement.  In the event of any inconsistency in the duties and/or obligations of the Property Manager as set forth in this Agreement and the Property Management Agreement, the terms and provisions of the Property Management Agreement shall govern and control the duties and the obligations of the Property Manager.

### 6.    RENEWAL; TERMINATION.

This Agreement may be terminated by either Owner or Asset Manager, with or without cause, at the end of the initial term or of any following term year upon the giving of sixty (60) days prior written notice prior to the end of said initial term or following term year.

### TERMINATION FOR CAUSE

Notwithstanding the foregoing, this Agreement shall terminate in any event, and all obligations of the parties hereunder shall cease (except as to liabilities or obligations which have accrued or arisen prior to such termination, or which accrue pursuant to Section 3 and 5 as a result of such termination, and obligations to insure and indemnify as expressly set forth herein), upon the occurrence of any of the following events:

### BREACH OF AGREEMENT

Thirty (30) days after the receipt of notice by either party to the other specifying in detail a material breach of this Agreement, if such breach has not been cured within said thirty (30) day period; or if such breach is of a nature that it cannot be cured within said thirty (30) day period but can be cured within a reasonable time thereafter, if efforts to cure such breach have not commenced or/and such efforts are not proceeding and being continued diligently both during and after such thirty (30) day period prior to the breach being cured. However, the breach of any obligation of either party hereunder to pay any monies to the other party under the terms of this Agreement shall be deemed to be curable within thirty (30) days.

### FAILURE TO ACT

In the event that any insurance required of Owner is not maintained without any lapse, or it is alleged or charged that the Premises, or any portion thereof, or any act or failure to act by Owner, its agent and employees with respect to the Premises, fails to comply with any law or regulation, or any order or ruling of any public authority, and Asset Manager, in its sole discretion, considers that the action or position of Owner or its representatives with respect thereto may result in damage or liability to Asset Manager, or disciplinary proceeding with respect to Asset Manager's license, Asset Manager shall have the right to terminate this Agreement at any time by written notice to Owner of its election to do so, which termination shall be effective upon the service of such notice. Such termination shall not release the indemnities of Owner set forth herein.

## INADEQUATE INSURANCE

If Manager deems that the liability insurance obtained by Owner is not reasonably satisfactory to protect its interest under this Agreement, and if Owner and Asset Manager cannot agree as to adequate insurance, Asset Manager shall have the right to cancel this Agreement upon the service of notice to Owner.

## BANKRUPTCY OR INSOLVENCY

In the event a petition in bankruptcy is filed by or against either Owner or Asset Manager, or in the event that either shall make any assignment for the benefit of creditors or take advantage of any insolvency act, either party hereto may forthwith terminate this Agreement.

## SUIT OR ACTION

If any suit or action is instituted by either party hereto in connection with any controversy arising out of this Agreement, Owner or Asset Manager shall have right to terminate this Agreement. The prevailing party in such action shall be entitled to recover, in addition to costs of suit, such sum as the court may adjudge reasonable as attorney fees in such suit or action and on any appeal from any judgment or decree entered thereon.

## TERMINATION ON SALE

This Agreement shall automatically terminate upon the sale of the Property.

7. **NOTICES**. All notices, demands, consents, approvals, reports and other communications provided for in this Agreement shall be in writing and shall be given at the address set forth below or at such other address as the parties may specify hereafter in writing via first class mail, return receipt requested.

      Owner:                    Hubbard Properties, LLC
                                    150 John's Pass Boardwalk West
                                    Madeira Beach, FL 33708
                                    Attn:    Patricia Hubbard

      Asset Manager:          Fameco Management Services Associates, LP
                                    633 West Germantown Pike, Suite 200
                                    Plymouth Meeting, PA 19462
                                    Attn:    Lawrence R. Zipf, President

## 8.      MISCELLANEOUS.

**8.1      Assignment.** The Asset Manager may not assign this Agreement without the prior written consent of the Owner.

**8.2      Gender.** Each gender shall include the other gender. The singular shall include the plural and vice-versa.

**8.3      Amendments.** Each amendment, addition or deletion to this Agreement shall not be effective unless approved in writing by all of the parties hereto.

**8.4    Attorneys' Fees.**  In any action or proceeding between the Asset Manager and Owner arising out of, from or relating to this Agreement or the enforcement or interpretation hereof, the party prevailing in such action or proceeding shall be entitled to recover from the other party or parties all of its reasonable attorneys' fees and other costs and expenses of the action or proceeding.

**8.5    Governing Law; Venue.**  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without regard to any choice of law rules.  Any action relating to or arising out of this Agreement shall be subject to binding arbitration in Pinellas County, Florida, as provided in Section 8.14.

**8.6    Indemnification by the Owner.**  Asset Manager assumes no liability whatsoever for any acts or omissions of Owner, or any previous owners of the Premises, or any previous management or other agent of either. Asset Manager assumes no liability for any failure of or default by any tenant in the payment of any rent or other charges due Owner or in the performance of any obligations owed by any tenant to Owner pursuant to any lease or otherwise. Nor does Asset Manager assume any liability for previously unknown violations of environmental or other regulations that may become known during the period this Agreement is in effect. Any such regulatory violations or hazards discovered by Asset Manager shall be brought to the attention of Owner in writing, and Owner shall promptly cure them.

The Owner shall indemnify, defend and hold harmless the Asset Manager and each of its members, managers, shareholders, officers, directors, employees and contractors (each an "Indemnified Party") from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, sustained or incurred by or asserted against any Indemnified Party with respect to the Asset Management Services, the Property, except those which arise directly and solely from the gross negligence, willful misconduct or fraud of the Asset Manager or an Indemnified Party.  If an Indemnified Party seeks indemnification hereunder, for a third-party claim, then (a) the Indemnified Party shall give the Owner prompt written notice thereof; (b) the Owner may defend such claim or action by qualified legal counsel of their choosing, provided such counsel is reasonably satisfactory to the Asset Manager; and (c) neither the Indemnified Party nor the Owner shall settle any claim without the other's prior written consent.  The provisions of this Section 8.6 shall survive the termination or resignation of the Asset Manager or termination of this Agreement.

**8.7    Indemnification by the Asset Manager.**  The Asset Manager shall indemnify, defend and hold harmless the Owner from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, sustained or incurred by or asserted against Owner with respect to the Asset Management Services or the Property which arise directly and solely from the gross negligence, willful misconduct or fraud of the Asset Manager, its members, managers, shareholders, officers, directors, employees or contractors.  If the Owner seeks indemnification hereunder for a third-party claim, then (a) the Owner shall give the Asset Manager prompt written notice thereof; (b) the Asset Manager may defend such claim or action by qualified legal counsel of their choosing, provided such counsel is reasonably satisfactory to the Owner; and (c) neither the Asset Manager nor the Owner shall settle any claim without the other's prior written consent.  The provisions of this Section 8.7 shall survive the termination or resignation of the Asset Manager or termination of this Agreement.

**8.9    Complete Agreement.**  This Agreement shall supersede and take the place of any and all previous agreements entered into between the parties with respect to the Asset Management Services.

**8.10    Severability.**  If any provision of this Agreement or application to any party or circumstances shall be determined to be invalid and unenforceable to any extent, the remainder of this Agreement shall not be affected thereby, and each other provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

**8.11    No Waiver.**  The failure by any party to insist upon the strict performance of, or to seek remedy of, any one of the terms or conditions of this Agreement or to exercise any right, remedy or election set forth herein or permitted by law, in equity or otherwise, shall not constitute or be construed as a waiver or

relinquishment for the future of such term, condition, right, remedy or election, but such item shall continue and remain in full force and effect. All rights or remedies of the parties specified in this Agreement and all other rights or remedies that they may have at law, in equity or otherwise shall be distinct, separate and cumulative rights or remedies, and no one of them, whether exercised or not, shall be deemed to be in exclusion of any other right or remedy of the parties.

**8.12    Binding Effect.**  This Agreement shall be binding and inure to the benefit of the parties and their respective heirs, successors and assigns.

**8.13    Enforcement of the Asset Manager's Rights.**  In the enforcement of its rights under this Agreement, the Asset Manager and any Indemnified Party shall not seek or obtain a money judgment or any other right or remedy against any disclosed or undisclosed principals of the Owner.  Instead, the Asset Manager and each Indemnified Party shall enforce its rights and remedies solely against the Owner in their respective Interests, funds from the Property from all sources and the proceeds of any sale or refinance of all or any portion of the Property.

**8.14    Binding Arbitration.**  Any dispute, claim or controversy arising out of or related to this Agreement, the breach hereof, the termination, enforcement, interpretation or validity hereof, or any other matter related directly or indirectly to the Property shall be settled by binding arbitration in Pinellas County, Florida, in accordance with the rules of The American Arbitration Association ("AAA"), and judgment entered upon the award rendered may be enforced by appropriate judicial action pursuant to Florida law.  The arbitration panel shall consist of a single arbitrator agreed to by each party to the dispute within thirty (30) days following notice by one party that he desires arbitration.  If the parties are unable within such thirty (30) day period to agree upon a single arbitrator, then the arbitrator shall be selected by the AAA, which arbitrator must be experienced in the area of real estate and knowledgeable with respect to the subject matter area of the dispute.  The losing party shall bear any fees and expenses of the arbitrator, other tribunal fees and expenses, reasonable attorneys' fees of all parties, any costs of producing witnesses and any other reasonable costs or expenses incurred.  The arbitrator shall render a decision within thirty (30) days following the close of presentation by the parties of their cases and any rebuttal.  The parties shall agree within thirty (30) days following selection of the arbitrator to any prehearing procedures or further procedures necessary for the arbitration to proceed, including interrogatories or other discovery.  **BY EXECUTING THIS AGREEMENT, YOU ARE AGREEING TO HAVE ALL DISPUTES DECIDED BY NEUTRAL ARBITRATION, YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE SUCH DISPUTES LITIGATED IN A COURT OR JURY TRIAL, AND YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL.  IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE.  BY EXECUTING THIS AGREEMENT, YOU HEREBY CONFIRM THAT YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.**

**8.15    Counterparts.**  This Agreement may be executed in counterparts, which, when taken together, shall be deemed one fully executed original.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

<div style="margin-left:40%">

**ASSET MANAGER:**

**FAMECO MANAGEMENT SERVICES ASSOCIATES, LP, a Pennsylvania limited partnership**

**By:**    **Fameco Management Services, LLC Its sole general partner**

By:    _____
Name:  Lawrence R. Zipf
Its:     President


**OWNER:**

_____
a _____ limited liability company

    By:
    _____
Its:    _____

</div>

# PROPERTY MANAGER'S CONSENT

The Property Manager hereby executes this Agreement to acknowledge its consent to follow the terms and conditions of this Agreement, including, but not limited to, <u>Section 5</u> hereof.

**PROPERTY MANAGER:**

The Shopping Center Group, LLC

By: _____

Name: _____

Its: _____

**Schedule A**

Scope of Asset Management Services

| Service | Notes |
|---|---|
| **Approvals by the Owner** | Requests for obtaining approvals from Owner |
| **Leasing** | |
| Selecting Leasing broker | Subject to Owner approval |
| Establishing leasing parameters | Subject to Owner approval |
| Approving lease deal terms | Subject to Owner approval |
| Approving lease form | Subject to Owner approval |
| Legal documentation of deal | Once approved by Asset Manager the documentation process with legal counsel would be initiated |
| Lease execution | Owner or Asset management responsibility (TBD) |
| **Defaults of tenants** | Decision as to whether a tenant may be placed in default is asset management level decision in conjunction with Owner; implementation of action to default tenant is property management decision, which would include engaging legal representation to collect on money for possession of premises |
| **Property Budget** | Initial budget prepared by Asset Manager with Property Manager and approved for implementation by Asset Manager before going to Owner for final approval |
| **Capital Expense** | Property Manager required to obtain Asset Manager approval before proceeding even if it is in the Property Budget, previously approved by Asset Manager and Owner |
| **Tenant Improvements** | Property Manager required to obtain Asset Manager approval before proceeding even if it is in the Property Budget, previously approved by Asset Manager and Owner |
| **Cash Management** | |
| Disbursement of property level expenses | Performed by Property Manager and reviewed and approved by Asset Manager |
| Payment of debt service | Performed by Property Manager and reviewed and approved by Asset Manager |
| Reserve draws requests | Performed by Property Manager and reviewed and approved by Asset Manager |
| Investment of excess cash | Asset Management responsibility with Owner approval |
| Depository Account | Performed by Property Manager and reviewed and controlled by Asset Manager |

| Service | Notes |
| --- | --- |
| Operating Account | Performed by Property Manager and reviewed and controlled by Asset Manager |
| Other accounts | Asset Management responsibility |
| Operation of Property | Performed by Property Manager and reviewed and controlled by Asset Manager |
| Third-party contracts to maintain property | Performed by Property Manager and reviewed and approved by Asset Manager |

**Risk Management**

| Service | Notes |
| --- | --- |
| Asset/property level | Asset Management responsibility |
| Tenant level | Performed by Property Manager and reviewed by Asset Manager |
| Third Party contractors | Performed by Property Manager and reviewed by Asset Manager |

**Records and Reports**

| Service | Notes |
| --- | --- |
| Operation and maintenance of Property | Performed by Property Manager and reviewed by Asset Manager |
| Books, records and accounts of property | Performed by Property Manager and reviewed and approved by Asset Manager |
| Monthly reports to Owner | Performed by Property Manager and reviewed and approved by Asset Manager |
| Strategic Business Plan | Asset Management responsibility |
| **Collection of Income** | Performed by Property Manager and reviewed and approved by Asset Manager |
| **Portfolio Risk Analysis** | Work with Owner to analyze perceived real estate risks, their goals for real estate returns and investment goals and hold/sell strategy.  Risk assessment report with major issues identified |
| **Oversight of Property Management team** | Oversight of property management team on financial reviews, reporting requirements and operational issues to ensure compliance with ownership directives |
| **Property Reviews** | Review property performance versus market.  Report with financial analysis current returns with suggestions for potential improvements |
| **Monitoring Loan Compliance** | Asset Management responsibility and Owner approval |
| **Property Tax Appeal** | Asset Management responsibility with consultant implement process and charged at property level |
| **Emergency Response Planning and Implementation** | Performed by Property Manager and reviewed and approved by Asset Manager |

**Schedule B**

**SCHEDULE OF PROPERTY MANAGEMENT SERVICES TO BE PROVIDED BY PROPERTY MANAGER AND OVERSEEN BY ASSET MANAGER**

| Services Available | By Property Manager | By Asset Manager |
|---|---|---|
| 1. **New Construction Plan Review** | X | |
| 2. **Construction Coordination** | X | |
| 3. **Consulting for Total Property Services Operations** | X | |
| 4. **Accounting** | X | |
| 5. **Coordination of Building Improvements** | X | |
| 6. **Coordination of Capital Improvement Projects** | X | |
| 7. **Other** | | |
| a.   Team Inspections | X | X |
| b.   Property Services Lease Review | X | X |
| c.   Landlord/Tenant Lease Administration | X | Review |
| d.   Provide Local and National Market Data | X | |
| e.   Tenant Relations | X | Review |
| f.   Annual Operating Plan/Budget | X | Review |
| g.   Financial/Cash Management | X | Review |
| h.   Monthly Reports | X | Review |
|    (1)   Rent Roll | X | Review |
|    (2)   Reconciliation of Rents, Miscellaneous Fees | X | Review |
|    (3)   Delinquencies | X | Review |
|    (4)   Accounts Payable | X | Review |
|    (5)   Cash Disbursements | X | Review |
|    (6)   Purchase Journal | X | Review |
|    (7)   Security Deposits | X | Review |
|    (8)   Bank Statements, Reconciliation of Accounts | X | Review |
|    (9)   Income and Expense Summary | X | Review |
| i.   Personnel Administration and Training | X | |
| j.   Purchasing and Vendors Administration | X | |
| k.   Service Contract Administration | X | |
| l.   Management of all Property Operations, Maintenance and Repair | X<br>X | |
| m.   Develop and Administer Operating Procedures | X | |
| n.   Preventive Maintenance Scheduling | X | |
| o.   Utilities Usage Review | X | |
| p.   Develop and Administer Safety and Security Programs | X | |
| q.   Code Compliance Review | X | |
| r.   Valuation Services (Equipment, Land, Building) | No | |
| s.   Tax Assessment Review | No | X |

## MANAGEMENT AGREEMENT

THIS AGREEMENT, made and entered into effective as of ___ day of _____, 2011, by and between _____ Hubbard Properties, LLC (hereinafter referred to as the "Owner") and The Shopping Center Group, LLC, a Georgia limited liability company (hereinafter referred to as "Manager");

W I T N E S S E T H, That:

WHEREAS, the Owner desires to employ Manager as the exclusive agent to supervise and manage the operation of the real property together with improvements commonly referred to as Hubbard Properties, LLC (John's Pass Boardwalk) (hereinafter referred to as the "Project"), which is located at 150 John's Pass Boardwalk West, Madeira Beach, FL 33708, and is more specifically described in Exhibit A attached hereto;

WHEREAS, Owner represents that it is the sole owner of the Project, and Owner has provided to Manager a copy of the recorded deed whereby sole title to the Project was conveyed to Owner; and

WHEREAS, in accordance with the terms hereof, Manager desires to perform such services for the Owner in consideration of the compensation set forth herein.

NOW, THEREFORE, in consideration of the premises and the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1.    Employment of Manager

The Owner hereby employs Manager under the terms and conditions of this Agreement as the general manager of the Project.  Manager hereby accepts such employment and does hereby agree to use its best efforts in the performance of its duties hereunder.

Section 2.    Term

2.1    Term.  The term of this Agreement shall commence on the date set forth above and shall, unless sooner terminated as provided in Sections 4.1 and 4.2, terminate at 5:00 p.m. on the last day of the month that is twelve (12) full calendar months following the date set forth above, plus any partial calendar month, but if neither party notifies the other party in writing at least thirty (30) days

prior to the expiration of the term, this Agreement shall be automatically extended for an additional twelve (12) calendar month period. Absent a writing hereafter signed by Owner and Manager, in no event shall the term of this Agreement extend beyond a date that is sixty (60) full calendar months after the date set forth above plus any partial calendar month. Notwithstanding the foregoing, this Agreement shall automatically terminate upon the sale of the entire Project.

Section 3.    Duties of Manager

3.1    Duties. Manager's responsibilities hereunder as the exclusive manager of the Project shall include, without limitation, the following specific duties, all of which shall be performed at the sole cost and expense of the Owner (unless otherwise provided herein) and for, on behalf of, and in the name of, the Owner and the direction of the Asset Manager, where applicable:

3.1.1    Obtaining all necessary governmental approvals and permits and performing such acts as shall be necessary to effect compliance on the part of the Owner with all laws, rules, ordinances, statutes, and regulations of any governmental authority applicable to the operation of the Project;

3.1.2    (a) Employing and supervising the performance of all full or part time on-site employees and maintenance personnel, and (b) negotiating contracts on behalf of the Owner and on terms approved by the Owner, and supervising the performance of all independent contractors, subcontractors, suppliers, and servicing agents required for the proper management, maintenance, repair, and operation of the Project and the construction of Tenant Improvements;

3.1.3    Paying the fees, charges, expenses, and commissions of all independent contractors, architects, engineers, subcontractors, suppliers, and service agents utilized in the management, operation, maintenance and repair of the Project and the construction of Tenant Improvements;

3.1.4    Paying (a) all or an appropriate part of the wages, salaries, commissions, and employee benefits of all full or part time on-site employees and maintenance personnel employed by Manager pursuant to Paragraph 3.1.2 other than central office personnel of Manager, and (b) all or an appropriate part of all amounts due for workmen's compensation insurance, social security taxes, unemployment insurance, and all other taxes or levies now in force or hereafter imposed with respect to any such employees or personnel;

3.1.5    Purchasing all necessary supplies and equipment required for the proper operation, maintenance, repair and restoration of the Project, and the construction of Tenant Improvements;

3.1.6    Making or causing to be made all repairs, replacements, renovations, and capital improvements on the Project approved by the Owner or as provided in Section 5;

3.1.7    Entering into contracts for or otherwise arranging for the delivery of, and paying all charges owed by the Owner for all utilities used in the operation of the Project, including, without limitation, water, electricity, gas, telephone, and sewerage services;

3.1.8    At the request and approval of Owner, retaining a tax consultant to appeal the ad valorem and property taxes;

3.1.9    At the request of the Owner, obtaining and keeping in effect policies of insurance with respect to the Project of the types and in amounts acceptable to the Owner;

3.1.10  Employing attorneys to handle any legal matters involving the Project with prior consent from the Owner;

3.1.11  Advertising the Project by such forms of advertisement as Manager and the Owner shall deem appropriate;

3.1.12  Collecting from all Tenants or occupants of the Project the rent and other charges payable under all Tenant Leases;

3.1.13  Furnishing to the Tenants or occupants of the Project such services as are usually or customarily furnished by Manager or rendered in connection with the rental of space in a shopping center such as the Project or as are reasonably required to be furnished by the landlord or lessor under any Tenant Lease or as are reasonably requested by the Owner;

3.1.14  Taking such action from time to time as Manager deems advisable for the efficient and economic management, operation, and maintenance of the Project and performing all other functions or services in or about the Project as Manager shall deem appropriate for the efficient and economic management, operation, and maintenance of the Project; and

3.1.15  Paying, unless otherwise directed by Owner, all Debt Service due under any Mortgage.

3.2     Manager shall assume responsibility hereunder for the following specific duties, all of which shall be performed at the sole cost and expense of Manager:

3.2.1    Preparing monthly reports to the Owner in a format as reasonably requested by the Owner or an authorized representative of the Owner;

3.2.2    Preparing year-end financial and management reports;

3.2.3   When requested by the Owner or an authorized representative of the Owner, preparing or causing to be prepared consolidations of all commonly owned properties managed by Manager in the format reasonably requested by the Owner or an authorized representative of the Owner;

3.2.4   Preparing or causing to be prepared all information regarding the financial position and results of operations of the property necessary for the on-site completion of an annual audit as may be provided in Section 6.2.

3.2.5   Maintaining financial and business books and records for the Owner as required by Section 6 hereof.

3.2.6   Holding any security deposits and prepaid rent that is paid by a tenant during the term of this Agreement.

Section 4:

4.1   <u>Termination for Cause.</u>  In the event that Manager shall (a) fail or refuse, as a result of any willful or intentional misconduct or negligence, to perform any of its material covenants, obligations, or duties hereunder or (b) fail to perform any of such covenants, obligations, or duties in a manner consistent with the standard of care customarily employed by exclusive managers of shopping centers similar in nature to the Project in the metropolitan area in which the Shopping Center is located, the Owner shall have the right to place Manager in default by written notice specifying Manager's defaults.  If Manager fails to cure such default to Owner's reasonable satisfaction within seven (7) days following Manager's receipt of such default notice, the Owner shall have the right to terminate this Agreement upon written notice to Manager.

In the event Owner fails to make available sufficient funds for Manager to perform its duties as set forth in this Agreement and to timely compensate Manager, and Owner fails to cure such default within seven (7) days after written notice thereof to Owner, Manager shall have the right to terminate this Agreement upon written notice to Owner.

4.2   <u>Termination without Cause</u>. Notwithstanding the provisions of Section 2.1 of this Agreement, either party shall have the right to terminate this Agreement, without cause, upon sixty (60) days written notice to the other party.

4.3   <u>Effect of Termination</u>. In the event of termination of this Agreement, Manager shall be entitled to receive its compensation computed hereunder through the effective date of termination, or, if such date is not the last day of a month, a pro rata portion of the month in which the effective date occurs. Upon the termination of this Agreement, Manager shall render an accounting to the Owner and, upon payment of all fees due Manger through the effective date of any termination, provide Owner with any and all files, in electronic or paper format, related to the

Project, and the management of the Project. Thereafter neither Manager nor the Owner shall have any rights, duties, or obligations hereunder, except for any obligations which expressly survive the termination of the Agreement.  However, the Owner shall remain bound by the obligations of all contracts for services, supplies, and alterations Manager has entered into in connection with the performance of its obligations hereunder.

## Section 5. Authority of Manager

5.1   General Authority.   Subject to the provisions of Sections 5.2 and 5.3, Manager shall have, and is hereby granted, full and complete power, authority, and discretion to act for, and in the name, place, and stead of, the Owner with respect to all matters relating to the management, maintenance, repair, and operation of the Project. Manager shall not be required to obtain competitive bids in connection with services that it obtains on Owner's behalf, nor shall Manager be required to use the least expensive service or service provider; in no event shall Manager employ a related or affiliated entity to perform any such services without the prior written consent of Owner. In all events, Owner is relying on Manager to obtain quality service at commercially reasonable prices.

5.2   Expenditure Limitation.   Manager shall not, without the prior written authorization of the Owner, expend any sums or incur any obligation for the expenditure of sums with respect to any item of expense other than (i) expense items within ten percent (10%) of the approved estimated expense set forth on the annual budget prepared by Manager pursuant to Section 6.4 hereof and approved by Owner, and (ii) a Tenant Improvement in an amount not exceeding $3,000.00 or (ii) an instance of maintenance, repair or alteration of the Project, in an amount not exceeding $3,000.00 (other than any expense or expenditure reasonably incurred by Manager in any emergency to prevent damage and/or secure the life/safety of the Project).

5.3   Request for Owner's Consent, Approval, or Authorization.  Subject to Manger's rights under Section 5.2, if Manager shall determine that it is appropriate for the proper management or operation of the Project to do any acts as to which Owner's / Asset Manager's prior written consent, approval, or authorization, as the case may be, is required hereunder, Manager may by written notice to Owner / Asset Manager request Owner's / Asset Manager's written consent, approval, or authorization thereto.  Unless Owner delivers to Manager, within ten (10) days after receipt of any written request by Manager for the written consent, approval, or authorization of Owner, a written statement expressly refusing such consent, approval, or authorization, Owner shall be conclusively and irrevocably deemed for all purposes under this Agreement to have expressly given the written consent, approval, or authorization, as the case may be, requested by Manager and to have expressly authorized and empowered Manager to do all things necessary or appropriate in Manager's judgment, to do that act with respect to which such consent, approval, or authorization of Owner was requested by Manager.  For each transaction in an amount exceeding $5,000.00, Manager must provide Owner with a second notice, which may be given by email, fax, overnight delivery or certified mail, return receipt requested.  If Owner does not respond within five (5) days of receipt of said second notice, then Owner will be deemed to have approved the transaction

requested to be made by Manager.

5.4     Additional Powers of Manager – Administrative.  In addition to any other powers that it may have under and pursuant to the provisions of this Agreement, and subject to obtaining Owner's / Asset Manager's prior written consent, Manager is hereby specifically authorized and empowered to execute, as agent for and in the name of Owner, (a) any forms or documents required from time to time to be presented to and/or executed by the owner of real property located in the State of Florida under the laws of the State of Florida or under the laws, rules, or regulations of any other governmental entity having jurisdiction over the Owner or the Project, and (b) any and all forms required to be filed with any governmental authority by the Owner in connection with entity maintenance, annual registration fees, franchise taxes, or any related matters.

Section 6.     Accounting

6.1     Books of Account.     Manager, at its expense, shall maintain or cause to be maintained true and accurate books of account reflecting the operation of the Project in accordance with sound accrual basis accounting practices, consistently applied, unless otherwise instructed by the Owner or Owner's representatives.

6.2     Financial and Operating Statements.  Manager, at its expense, shall prepare or cause to be prepared and shall furnish to the Owner / Asset Manager promptly after the closing of each calendar month a report which shall include (a) an unaudited balance sheet prepared on an accrual or cash basis (such accounting method to be selected by Owner at the commencement of the term of this Agreement) reflecting the financial position of the Project at the close of such month; (b) an unaudited income statement prepared on an accrual or cash  basis (as selected by Owner) reflecting the results of operations for the Project for both the calendar month and year-to-date, and said income statement is to include a comparison to budgeted income and expenses for both the calendar month and year-to-date; (c) general ledger; (d) bank statement and reconciliations; (e) rent roll; (f) a discussion of any current vacancies in the Project and any vacancies likely to occur; (g) a discussion of any significant repairs or maintenance which the Project will require and of any needs foreseen by Manager for reserves of funds to be created in future months for such purposes; (h) a discussion of significant variations from the budgeted income and expenses of the Project for both the current month and fiscal year-to-date; (i) a recap of tenant sales reported to Manager and a discussion of any appropriate deviations from previous expectations; and (j) provide an aged receivable report illustrating arrearage on a tenant by tenant basis.  If requested by Owner, the financial statements shall be certified by a firm of independent certified public accountants selected by the Owner or a qualified representative of the Owner; provided, however, that the cost of having such financial statements certified by such a firm of accountants shall be borne by the Owner.

6.3     Examination of Books.          The Owner, at its expense, shall have the right at all reasonable times during normal business hours to audit, examine, and make copies of or extracts from the business records or books of account maintained by Manager pursuant to this Section 6, and such right may be exercised through any designated agent or employee of the Owner.

Manager will file and store all documents for the current operating fiscal or calendar year and one year prior.  Any documents required by Manager to store beyond the prior operating year shall be stored off site from Manager's office at Owner's expense.

6.4 <u>Budget</u>.    Manager shall prepare, at its expense, and deliver to the Owner / Asset Manager each of the following:

(a) Within sixty (60) days following the commencement of the term of this Agreement, and thereafter, at least thirty (30) days prior to the start of each calendar year during the term hereof, an annual operating budget, setting forth Manager's forecast of gross income, operating expenses, capital costs and expenses, and net income for the Project for such calendar year, which budget must be approved or revised in writing by the Owner / Asset Manager within thirty (30) days after submission by Manager, and

(b) Promptly after the end of each calendar month during the term of this Agreement, a statement setting forth a monthly reconciliation of the actual operations of the Project for such calendar month with the annual budget therefore, together with year to date summary analysis of actual expenses and income versus the annual budget.

<u>Section 7.</u>    <u>Banking</u>

7.1 <u>Separate Accounts.</u>    All rental income and other funds of the Owner which are received by Manager hereunder shall be deposited and held in a separate bank account or accounts maintained by Manager.  All such funds shall be and remain the property of the Owner and shall be disbursed by Manager only to pay the obligations of the Owner set forth herein, or, subject to the provisions of Section 7.2, to the Owner at its request.  In no event shall the funds of anyone else be deposited in any such accounts and Manager shall not commingle the Owner's funds with the funds of anyone else in any manner whatsoever.

7.2 <u>Owner's Duty to Provide Funds.</u>    The Owner, by making deposits to or by refraining from withdrawing funds from the bank account or accounts established pursuant to Section 7.1, shall at all times maintain sufficient funds in such account or accounts to enable Manager to pay as and when due all obligations of the Owner required to be paid hereunder or incurred by Manager in the performance of its duties hereunder (except for obligations which are to be at the expense of Manager), including, without limitation, obligations of the Owner to Manager hereunder.

7.3 <u>Disbursements.</u>    Manager may disburse to itself all amounts due it pursuant to this Agreement and any other agreement between the parties from the bank account or accounts maintained by Manager in accordance with Section 7.1 and 7.2 hereof; provided, however, that any such amounts which Manager disburses to itself hereunder shall be accounted for by Manager in the

next monthly statement furnished the Owner pursuant to Section 6.2 hereof. Manager's right to disburse funds from the funds of the Owner shall survive the termination of the Agreement until such time as all amounts due Manager under this Agreement and any other agreement between the parties are paid in full.

7.4     Reimbursement of Manager.  Manager shall not be required to disburse funds on behalf of Owner for any reason whatsoever if there are not sufficient funds in the bank account or accounts maintained by Manager in accordance with Section 7.1 and 7.2 hereof.  In the event Manager should advance any amounts from its own funds (which Manager may but shall not be obligated to do), rather than from the funds of the Owner, in payment of any of the obligations of the Owner approved with respect to the Project (including any obligations incurred by Manager in the performance of its duties hereunder), the Owner, upon request of Manager, shall promptly reimburse Manager, or Manager may promptly reimburse itself, from the bank account or accounts maintained in accordance with Section 7 hereof.  Any such reimbursement which Manager reimburses to itself shall be accounted for by Manager in the next monthly statement furnished to the Owner pursuant to Section 6.2 hereof, provided that such request for reimbursement is accompanied by an itemized statement of all amounts so advanced, together with invoices and canceled checks for such amounts.

Section 8.     Standard of Care; Liability; Indemnity

8.1     Standard of Care.      In the performance of its duties and obligations under this Agreement, Manager shall diligently and in good faith seek to protect the property rights and interests of the Owner in the Project and to promote the best economic interests of the Owner in its ownership and operation of the Project. Manager does not guarantee the payment of rental and other charges by the tenants, but will make every reasonable effort to collect the same when and as they become due.

8.2     Liability of Manager.  Manager shall not be liable for any errors of judgment or for the mistakes of fact or of law or for anything which it may in good faith do or refrain from doing hereunder, except in the case of its willful misconduct, fraud or gross negligence.

8.3     Indemnity by the Owner.
The Owner shall defend, indemnify and hold Manager and its affiliates (i.e, any parent or subsidiary company or entity) and the employees of each  harmless from and against any and all losses, liabilities, damages, claims, demands, judgments, orders, fines, penalties, cost and expenses (including without limitation court costs, experts and reasonable attorneys' fees) relating to the Project or otherwise arising out of or in connection with this Agreement or the performance by Manager of its obligations or duties hereunder, and Owner hereby waives and covenants not to sue Manager and any of its affiliates or the employees of each in connection therewith, provided, however, that the foregoing obligation to defend, hold harmless and indemnify shall not apply to the extent that any of the foregoing were caused by the grossly negligent, fraudulent or intentional misconduct of Manager or its affiliates or employees. The provisions of this Section 8.3 shall survive the termination or expiration of this Agreement.

8.4 <u>Indemnity by Manager.</u>    Manager shall indemnify the Owner against and hold and save the Owner harmless from any loss, damage, or expense (including court costs and reasonable attorneys' fees) to the extent caused by the gross negligence, fraud or intentional misconduct of Manager or its agents or employees. The provisions of this Section 8.4 shall survive the termination or expiration of this Agreement.

8.5 <u>No Obligation to Third Parties.</u>    None of the obligations and duties of Manager under this Agreement shall in any way or in any manner be deemed to create any obligation of Manager to, or any rights in, any person or entity other than the Owner (including, without limitation, any Tenant or occupant of the Project or any Mortgagee).

<u>Section 9.</u>    <u>Compensation of Manager</u>

The amounts due Manager pursuant to Exhibit "B" and as otherwise set forth in this Agreement shall be paid monthly or  as otherwise set forth in Exhibit "B".

<u>Section 10.</u>    <u>Other Activities of Manager</u>

10.1 <u>Conflicts.</u>  During the term of this Agreement, (i) Manager and its affiliates, shareholders, officers, directors, and employees may render services identical or similar to those required of Manager hereunder to other owners of real property and (ii) Manager and its affiliates, shareholders, officers, directors, or employees may engage in the acquisition, development, leasing, rental, management, operation, sale, and exploitation of real property (whether improved or not) for their own accounts and benefit and in the case of  each of  the permitted actions described in (i) and (ii) of this Subsection 10.2, such actions may be undertaken without any accountability or liability whatsoever to the Owner even though such services or business activities compete with or are enhanced by the business activity of the Owner, including competing with or being enhanced by the Owner's ownership of the Project. Notwithstanding any provision in this Agreement to the contrary, Owner consents to such actions by Manager and its affiliates, shareholders, officers, directors, or employees, and acknowledges that no further disclosure shall be required.

<u>Section 11.</u>    <u>Assignment</u>

Manager shall not assign its rights or delegate its duties as general manager under this Agreement without consent of the Owner.

<u>Section 12.</u>    <u>Nature of Agreement</u>

The rights and duties hereby granted to and assumed by Manager are those of an independent contractor only.  Nothing contained herein shall be so construed as to constitute the relationship hereby created between Manager and the Owner / Asset Manager as an employment, a partnership, a joint venture, or a joint agency.

Section 13.    INSURANCE AND WAIVER OF SUBROGATION

(a)    Owner shall maintain (or if Owner fails to do so, Manager is hereby authorized but not obligated to maintain) as an expense of the Project at least $5,000,000 of commercial general liability coverage ("CGL coverage"), combined single limit per occurrence and in the aggregate per year (which policy shall include Manager as an additional insured), an all-risk replacement value property damage policy covering the full value of the Project and Owner's personal property and fixtures and rent loss coverage for at least twelve (12) months (with such deductibles as Owner deems reasonable and with a waiver of subrogation in favor of Manager), and such other coverage as Owner desires. All such insurance obtained by Owner shall be provided by an insurance company whose rating with AM Best is not less than "A". Regarding the CGL coverage, such insurance maintained by Owner for the benefit of Manager shall be considered primary insurance to any liability insurance maintained by Manager, except to the extent that the liability arises as a result of Manager's gross negligence or willful misconduct or actions of Manager outside the scope of Manager's authority under this Agreement. Any deductible or retention limit maintained by Owner shall be the responsibility of Owner. Owner shall provide Manager with evidence of such insurance. Owner shall look solely to such insurance for any damage, theft or other loss or claim involving the Project.

(b)    Manager shall maintain worker's compensation insurance in amounts required or permitted by statute and employers' liability insurance in the amount of at least $1,000,000 per occurrence if on-site workers will be on Manager's or its affiliate's payroll, commercial general liability insurance in a combined single limit of not less than $5,000,000 per occurrence and in the aggregate; automobile liability insurance at combined single limit of $1,000,000; comprehensive crime insurance including employee dishonesty in an amount of not less than $500,000. Regarding the CGL coverage, such insurance shall be considered excess insurance to any insurance maintained by Owner regarding the occupancy, management, operation or maintenance of the Project covered by this Agreement except to the extent that the liability arises as a result of Manager's gross negligence or willful misconduct or actions of Manager outside the scope of Manager's authority under this Agreement. Owner will not be listed as an additional insured on any policy that Manager is required to obtain pursuant to this Paragraph 13(b).

(c)    Owner and Manager waive any right to recover against each other for claims covered by their respective property policies of insurance. This provision is intended to waive fully, and for the benefit of Owner and Manager, any rights and/or claims that might give rise to a right of subrogation in favor of any property insurance carrier.

(d)    Manager shall promptly investigate all accidents, incidents, occurrences, and claims for damage arising out of or relating to the use, occupancy, ownership, operations and maintenance of the Project, and shall notify Owner of any occurrence including a report of any injuries, and any damage to or destruction of the Project and the estimated cost of repair. Manager shall promptly and in the manner required by the appropriate policy or policies of insurance, file all claims and shall use its best efforts to obtain payment therefore; provided, however, that Manager shall not conclude or

compromise any disputed claim in excess of $5,000 without the consent and approval of Owner.

Section 14.     Definitions

In addition to all other definitions provided in this Agreement, the following definitions are used throughout this Agreement:

14.1     "Agreement" means this Management Agreement and any exhibits attached hereto, all of which shall be deemed incorporated herein by this reference.

14.2     "Debt Service" means all payments (including principal, interest, and escrow deposits) required to be made under any mortgage.

14.3     "Gross Receipts" shall be defined as follows:

The amount of all revenue for the Project actually received, including, but not limited to:

     i)     Boardwalk – Rentals pursuant to all leases and occupancy agreements affecting the Project, including, without limitation, commercial, and storage leases for each month during the term of this Agreement;

     ii)     Parking garage – Gross receipts include only the verifiable net revenue associated with the parking garage (gross income less parking garage direct cost) independently managed by third party;

     iii)     non-refundable fees and security and other deposits forfeited during such period;

     iv)     proceeds from business income insurance, extra expense coverage, and excess rental value insurance (if provided in a lump sum, the amounts under this clause (iii) shall be allocated in equal monthly amounts over the estimated period of reconstruction and lease-up);

     v)     service charges on utilities billed by Manager and interest and income earned on deposited funds;

     vi)     late charges and fees;

     vii)     application and processing fees and forfeited application deposits;

     viii)     proceeds from vending machines or other concessions or the rental paid to

Owners by the supplier of such vending machines or other concessions, and proceeds from the periodic (but not "up-front" or "lump-sum") payments to Owners by suppliers of telecom, internet, and other services at the Project;

ix)     condemnation proceeds awarded for loss of rents (if provided in a lump sum, the proceeds shall be allocated in equal monthly amounts over the period for which the proceeds were awarded); and

x)      all other revenue from the Project.

14.4    "Tenant" means the tenant or lessee under any Tenant Lease.

14.5    "Tenant Improvement" means any improvements required to be constructed on, or any equipment or furnishings required to be installed within, any leasable space in the Project by the landlord or lessor under any Tenant Lease for such space.

14.6    "Tenant Lease" means any written lease, tenancy, occupancy agreement, or rental agreement affecting the Project, whether existing on the date hereof or entered into after the date hereof.

Section 15.    General Provisions

15.1    Modifications; Waiver.    No change or modification of the Agreement shall be valid or binding upon the parties hereto, nor shall any waiver of any term or condition, unless such change, modification, or waiver shall be in writing and signed by the parties hereto.

15.2    Binding Effect.    This Agreement shall inure to the benefit of and shall be binding upon the parties hereto, their legal representatives, transferees, successors, and assigns.

15.3    Duplicate Originals.    For the convenience of the parties hereto, any number of counterparts hereof may be executed, and each such counterpart shall be deemed to be an original instrument.

15.4    Construction.    This Agreement shall be interpreted and construed in accordance with the laws of the State of Florida.  The titles of the Sections and Paragraphs herein have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions herein.

15.5    Entire Agreement.    This Agreement is intended by the parties hereto to be the final expression of their agreement and is the complete and exclusive statement of the terms thereof, notwithstanding any representation or statement to the contrary heretofore made.

15.6    Notices.    All notices and other communications required under this Agreement

shall be in writing and shall be (a) delivered by hand or (b) sent by registered or certified U.S. mail, return receipt requested, or any nationally recognized overnight delivery service, addressed in either case as follows:

       To Owner:         Hubbard Properties, LLC
                                150 John's Pass Boardwalk West
                                Madeira Beach, FL  33708
                                Attention:  Patricia Hubbard

       To Manager:     The Shopping Center Group, LLC
                                300 Galleria Parkway, 12th Floor
                                Atlanta, Georgia  30339
                                Attention:  Bob Wordes, Chief Operating Officer

or at such other address or to the attention of such other person, as Manager or the Owner shall request by written notice given as herein provided. Any written notice or other communication given as herein provided shall be deemed to have been sufficiently given and received for all purposes hereunder on the date of hand delivery or the first business day after it is delivered to a nationally recognized overnight delivery service, such as Federal Express, or on the date three (3) days following the date on which the same is deposited, postage prepaid, in the United States general or branch post office or mailbox.

15.7    <u>Attorneys' Fees</u>.  In the event of a dispute under the provisions of this Agreement resulting in litigation between the parties, the prevailing party in such dispute shall be entitled to reasonable attorneys' fees and court costs.

15.8    <u>Severability</u> .
If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

15.9    <u>Authority</u>
The person executing this Agreement represents that he/she has the express authority to do so on behalf of the Owner and to legally bind the Owner to this Agreement.

15.10   <u>Recitals</u>
The recitals set forth on the first page of this Agreement are incorporated herein by reference as if expressly set forth herein.

15.11   <u>Disclosures.</u>    BY SIGNING THIS AGREEMENT, OWNER ACKNOWLEDGES THAT (I) AGENT HAS PROVIDED OWNER WITH A COPY OF ITS BROKER RELATIONSHIP POLICIES; (II) OWNER HAS READ ALL PROVISIONS AND DISCLOSURES MADE HEREIN AND IN SUCH POLICIES; (III) AGENT HAS MADE ALL REQUIRED DISCLOSURES VERBALLY OR IN WRITING PRIOR TO OWNER'S ENTERING INTO THIS AGREEMENT; AND (IV) OWNER UNDERSTANDS ALL SUCH PROVISIONS AND HAS ENTERED INTO THIS AGREEMENT VOLUNTARILY.


        IN WITNESS WHEREOF, the parties hereto have executed and sealed this Agreement, as of the day and year first above written.

<u>Owner</u>:

Hubbard Properties, LLC


By:_____

Name: _____

Title: _____

**STATE OF _____** )

                                             ) ss:

**COUNTY OF _____** )


       **This instrument was acknowledged before me, the undersigned authority, on _____, 2011.**

       **WITNESS my hand and official seal.**


**_____**
**Notary Public**

<u>Manager</u>:

The Shopping Center Group, LLC, a Georgia limited liability company


By:    _____

        Name: _____

        Title: _____

**STATE OF _____** )

                                               ) ss:

**COUNTY OF _____** )


       **This instrument was acknowledged before me, the undersigned authority, on _____, 2011.**

       **WITNESS my hand and official seal.**


**_____**
**Notary Public**

# EXHIBIT "A"
## LEGAL DESCRIPTION

1.   <u>Management Fee.</u>

As compensation for its services as the exclusive manager of the Project, the Manager shall receive a management fee equal to three and three quarter percent (3.75%) multiplied by the total Gross Receipts (as defined in Section 14.3) received for the month, but in no event shall the management fee due pursuant to this paragraph be less than $2,000.00 for any month during the term (pro rated for any partial month).

~~2.   Set Up Fee.~~

~~In order to defray Manager's startup expenses incidental to the obligations to be performed by Manager under this Agreement, owner shall pay Manager _____ Dollars upon the commencement date of this Agreement.~~

3.   <u>Fee for Supervision of Capital Improvements, Repairs and Replacements, and Landlord's Work.</u>

Manager shall receive a fee for supervision of capital improvements, repairs and replacements at the Shopping Center (including, but not limited to, the following examples: new roof for the Shopping Center, repair or re-striping of the parking lot), and for supervision of Landlord's Work, as defined in Tenant Leases.  Manager shall receive no compensation for supervising repairs of less than $3,000 or for supervising Landlord's Work that costs less than $3,000.  If the cost of capital improvements, repairs and replacements, or the supervision of Landlord's Work exceeds $3,000, then in such event, Manager shall receive a fee for supervision of such improvements, repairs and replacements, and for supervision of such Landlord's Work as follows:

a.   in the event there is general contractor, 5% of the total construction cost, paid to Manager when and as the construction cost is paid to the contractor, supplier or service provider; or

b.   in the event there is no general contractor, 10% of the total construction cost, paid to Manager when and as the construction cost is paid to the contractor or service provider.

4.   <u>Fee for Supervision of Tenant Improvements Made By Tenant.</u>

Manager shall receive a fee for supervision of Tenant improvements (performed by Tenant) for all Tenant improvement work on its premises undertaken after the execution of this Agreement, except as otherwise agreed upon by Owner and Manager, as follows:

a.   For specific Tenant improvements (performed by Tenant) for which Owner is

providing a tenant improvement allowance pursuant to such tenant's lease, an amount equal to the greater of $750.00 or 5% of the total cost of the Tenant improvements undertaken by Tenant, paid to Manager upon substantial completion of such Tenant improvement work;

b. For specific Tenant improvements (performed by Tenant) of shop spaces for which no tenant improvement allowance is provided by Owner, the fee shall be $750.00, paid to Manager at substantial completion of the subject construction; and

c. For specific Tenant improvements (performed by Tenant) for restaurant spaces or other shop spaces requiring extensive interior and exterior upfit or construction for which no tenant improvement allowance is provided by Owner, the fee shall be $1,500.00, paid to Manager at substantial completion of the subject construction.

5. <u>Additional Services.</u>

a. In the event there is a lease assignment from one tenant to another, the assignor shall pay Manager an administrative fee of $1,000.00 for processing the documents and facilitating the assignment and relevant documents, but if the applicable lease does not contain a provision requiring that the assignor pay such administrative fee in the amount of $1, 000.00, then such amount shall be paid by Owner.

6. <u>Office Expenses.</u>

Owner shall pay the following expenses as an expense of operation of the Project:

a. All postage, delivery and photocopy expenses related to operation and maintenance of the Project.

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

HUBBARD PROPERTIES, LLC,

Chapter 11

Case No: 8:11-bk-1274-KRM

Debtor.

_____/

### DECLARATION OF LAWRENCE R. ZIPF IN SUPPORT OF DEBTOR'S MOTION FOR AUTHORITY TO ENTER INTO MANAGEMENT AGREEMENT OR ALTERNATIVELY APPLICATION FOR ORDER AUTHORIZING EMPLOYMENT OF FAMECO MANAGEMENT SERVICES ASSOCIATES, L.P. AND THE SHOPPING CENTER GROUP, LLC AS PROPERTY MANAGER

The undersigned, Lawrence R. Zipf, hereby swears and declares under penalty of perjury pursuant to the provisions of 28 U.S.C. § 1746 that the following statements are true and correct:

1.     I am Lawrence R. Zipf.

2.     I am competent to provide this Declaration as required by Federal Rule of Evidence 601.

3.     I am President of Fameco Management Services Associates, L.P. ("Fameco") with offices located at 633 West Germantown Pike, Suite 200, Plymouth Meeting, PA 19462, and I am authorized to execute this Declaration on behalf of Fameco. Fameco has been asked, and has agreed, to assist Hubbard Properties, LLC (the "Debtor") in managing the Property,[1] the development and review of financial projections, and identifying operational efficiencies on an ongoing basis.

4.     Unless I have otherwise stated, I have personal knowledge of the facts contained in this Declaration as required by Federal Rules of Evidence 602. To the extent I relied on the books

---

1 Capitalized terms not otherwise defined in this Declaration shall have the meaning ascribed to them in the *Debtor's Motion for Authority to Enter into Management Agreement or Alternatively Application for Order Authorizing Employment of Fameco Management Services Associates, L.P. and The Shopping Center Group, LLC as Property Manager.*

{00162641.DOC;2}

and records of Fameco in making the statements in this Declaration, those books and records are comprised of business records maintained in the regular course of Fameco's business and it is Fameco's regular practice to make and maintain these records. Those business records reflect documents and entries that are input into the system at the time information becomes available by or at the direction of persons with personal knowledge of the matters contained therein. I am one of the persons who supplies information for the business records and I regularly use and rely upon the information contained in the business records in the performance of my duties at Fameco.

5.     The facts stated in this Declaration as to the relationship between me and the other employees of Fameco, the Debtor, the Debtor's creditors, and the other parties in interest, the U.S. Trustee and the attorneys representing the U.S. Trustee are based on my review of the business records and my personal knowledge.

6.     To the best of my knowledge and from the information available to me, I have concluded that Fameco does not hold or represent an interest adverse to the Debtor's estate and does not have any impermissible connection with the Debtor, any of its creditors, any party in interest, or the United States Trustee. Specifically, Fameco and its employees:

a)     are not equity holders of the Debtor;

b)     have not served as an employee, officer, director, or person in control of the Debtor or any affiliate of the Debtor at any time within two years prior to the Petition Date.

c)     are not relatives of any director, officer, employee, or any person in control of the Debtor or affiliate of the Debtor;

d)     have not served as an officer, director, or employee of a financial advisor which has been engaged by the Debtor in connection with the offer, sale or issuance of a security of the Debtor at any time; and

2

e)    are not performing and have not performed services for a creditor, general partner, lessor, lessee, party to an executory contract of the Debtor, or person otherwise adverse or potentially adverse to the Debtor, on any matter related to the Debtor or its estate.

7.    For services provided to the Debtor, Fameco will receive compensation as follows:

a.    Monthly asset management fee of the greater of $1,500.00 or 1.25% of gross receipts;

b.    $2,000.00 per day plus travel expenses at cost (expected to be 2 days) for initial site visit; and

c.    $225.00 per hour (to be capped at $5,000.00) for review of financial projections, preparation of a budget and cash flow forecast.

8.    This concludes my declaration.

Pursuant to 28 U.S.C. §1746, I hereby declare under penalty of perjury, that the foregoing is true and correct on this _9TH_ day of September, 2011.

_____
Lawrence R. Zipf

{00162641.DOC;2}

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Chapter 11

HUBBARD PROPERTIES, LLC,

Case No: 8:11-bk-1274-KRM

Debtor.

_____/

**DECLARATION OF JOHN SEBRING IN SUPPORT OF DEBTOR'S
MOTION FOR AUTHORITY TO ENTER INTO MANAGEMENT AGREEMENTS OR
ALTERNATIVELY APPLICATION FOR ORDER AUTHORIZING EMPLOYMENT
OF FAMECO MANAGEMENT SERVICES ASSOCIATES, L.P. AND
THE SHOPPING CENTER GROUP, LLC AS PROPERTY MANAGER**

The undersigned, John Sebring, hereby swears and declares under penalty of perjury

pursuant to the provisions of 28 U.S.C. § 1746, that the following statements are true and correct:

1.      I am John Sebring.

2.      I am competent to provide this Declaration as required by Federal Rule of

Evidence 601.

3.      I am Director of Property Management of The Shopping Center Group, LLC

("SCG"), with its principal place of business at 300 Galleria Parkway, 12th Floor, Atlanta, GA

30339, and I am authorized to execute this Declaration on behalf of SCG. SCG has been asked,

and has agreed, to perform management services for Hubbard Properties, LLC (the "Debtor"),

including the collection of rents from the Tenants,[1] oversight of repairs and maintenance of the

Property, the maintenance and preparation of basic business records, and reports relating to the

Property.

---

[1] Capitalized terms not otherwise defined in this Declaration shall have the meaning ascribed to them in the *Debtor's
Motion for Authority to Enter into Management Agreement or Alternatively Application for Order Authorizing
Employment of Fameco Management Services Associates, L.P. and The Shopping Center Group, LLC as Property
Manager.*

4.     Unless I have otherwise stated, I have personal knowledge of the facts contained in this Declaration as required by Federal Rules of Evidence 602. To the extent I relied on the books and records of SCG in making the statements in this Declaration, those books and records are comprised of business records maintained in the regular course of SCG's business and it is SCG's regular practice to make and maintain these records. Those business records reflect documents and entries that are input into the system at the time information becomes available by or at the direction of persons with personal knowledge of the matters contained therein. I am one of the persons who supplies information for the business records and I regularly use and rely upon the information contained in the business records in the performance of my duties at SCG.

5.     The facts stated in this Declaration as to the relationship between me and the other employees of SCG, the Debtor, the Debtor's creditors, and the other parties in interest, the U.S. Trustee and the attorneys representing the U.S. Trustee are based on my review of the business records and my personal knowledge.

6.     To the best of my knowledge and from the information available to me, I have concluded that SCG does not hold or represent an interest adverse to the Debtor's estate and does not have any impermissible connection with the Debtor, any of its creditors, any party in interest, or the United States Trustee. Specifically, SCG and its employees:

     a.     are not equity holders of the Debtor;

     b.     have not served as an employee, officer, director, or person in control of the Debtor or any affiliate of the Debtor at any time within two years prior to the Petition Date.

c.      are not relatives of any director, officer, employee, or any person in control of the Debtor or affiliate of the Debtor;

d.      have not served as an officer, director, or employee of a financial advisor which has been engaged by the Debtor in connection with the offer, sale or issuance of a security of the Debtor at any time; and

e.      are not performing and have not performed services for a creditor, general partner, lessor, lessee, party to an executory contract of the Debtor, or person otherwise adverse or potentially adverse to the Debtor, on any matter related to the Debtor or its estate.

7.      For services provided to the Debtor, SCG will receive compensation as follows:

a.      Monthly management fee equal to 3.75% of gross receipts;

b.      Fee for supervision of capital improvements, repairs and replacements, and landlord's work equal to 5% of the construction cost, in the event there is a general contractor. If there is no general contractor, the fee shall be 10%.

c.      Fee for supervision of tenant improvements, where Debtor is providing a tenant improvement allowance, an amount equal to the greater of $750.00 or 5% of the total cost of the improvement; a fee of $750.00 for tenant improvements where there is no tenant improvement allowance; and a fee of $1,500.00 for tenant improvement requiring extensive interior and exterior upfit or construction where there is no tenant improvement allowance.

8. This concludes my declaration.

Pursuant to 28 U.S.C. §1746, I hereby declare under penalty of perjury, that the foregoing is true and correct on this _9th_ day of September 2011.

_____
John Sebring