UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                              Chapter 11

HUBBARD PROPERTIES, LLC,                             Case No. 8:11-bk-1274-KRM

     Debtor.

_____/

**AMENDED DISCLOSURE STATEMENT IN CONNECTION WITH**
**AMENDED PLAN OF REORGANIZATION OF HUBBARD PROPERTIES, LLC**

David S. Jennis
Florida Bar No. 775940
James Allen McPheeters
Florida Bar No. 65434
**Jennis & Bowen, P.L.**
400 N. Ashley Dr., Ste. 2540
Tampa, FL 33602
Telephone: (813) 229-1700
Facsimile: (813) 229-1707
Email: djennis@jennisbowen.com
Counsel to the Debtor and Debtor-in-Possession

Dated: November 15, 2011

THIS AMENDED DISCLOSURE STATEMENT HAS NOT BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT.  A HEARING TO CONSIDER THE ADEQUACY OF THIS AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE **IS CURRENTLY SCHEDULED FOR DECEMBER 16, 2011 AT 11:30 A.M. EASTERN TIME.**  THE DEBTOR RESERVES THE RIGHT TO MODIFY AND SUPPLEMENT THIS AMENDED DISCLOSURE STATEMENT AND THE ACCOMPANYING AMENDED PLAN OF REORGANIZATION UP TO AND INCLUDING THE TIME OF CONFIRMATION OF THE AMENDED PLAN OF REORGANIZATION.  THE DEBTOR IS NOT CURRENTLY SOLICITING VOTES ON THE AMENDED PLAN OF REORGANIZATION.

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS *AMENDED DISCLOSURE STATEMENT IN CONNECTION WITH AMENDED PLAN OF REORGANIZATION OF HUBBARD PROPERTIES, LLC* (AS AMENDED, THE "DISCLOSURE STATEMENT") IS PROVIDED FOR PURPOSES OF SOLICITING VOTES ON THE *AMENDED PLAN OF REORGANIZATION OF HUBBARD PROPERTIES, LLC* (AS AMENDED, THE "PLAN"). THE INFORMATION MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF VOTES ON THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE STATED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY TIME AFTERWARDS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS AGAINST HUBBARD PROPERTIES, LLC, OR DEBTOR-IN-POSSESSION IN THIS CASE, SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX,

SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN HUBBARD PROPERTIES, LLC OR DEBTOR-IN-POSSESSION IN THIS CASE.

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ............................................................. 1

II.    PURPOSE OF THE DISCLOSURE STATEMENT ................................. 1

III.   THE CHAPTER 11 PROCESS ........................................................... 3

     A.   Explanation of the Reorganization Process. ........................................ 3

     B.   Voting Procedures. ............................................................................ 3

     C.   Confirmation. ..................................................................................... 4

     D.   Procedure for Filing Proofs of Claim and Proofs of Interest. ............. 5

IV.   INFORMATION REGARDING THE DEBTOR ...................................... 6

     A.   Overview and History of the Debtor. .................................................. 6

     B.   Debt Structure. .................................................................................. 6

     C.   Reasons for Filing Chapter 11. .......................................................... 7

     D.   Significant Events in the Reorganization Case. .................................. 9

     E.   The SARE Issues ............................................................................. 10

     F.   Appointment of Creditor's Committee ............................................. 11

     G.   Employment of Fameco and Shopping Center Group ....................... 11

     H.   Mediation ......................................................................................... 11

V.    SUMMARY AND ANALYSIS OF CLAIMS ...................................... 12

     A.   Claims Summary Chart .................................................................... 12

     B.   The IWA Claim ............................................................................... 13

     C.   Bifurcation of IWA's Claim ............................................................ 14

     D.   The 1111(b) Election ....................................................................... 15

VI.   HISTORICAL FINANCIAL PERFORMANCE AND FINANCIAL
       PROJECTIONS ............................................................................... 15

VII.  CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
       INTERESTS UNDER THE PLAN ..................................................... 16

VIII. CLAIMS ALLOWANCE AND PAYMENT, EXECUTORY CONTRACTS,
       REVESTING OF ASSETS ............................................................... 23

     A.   Allowed Claims, Distribution Rights, and Objections to Claims. ...... 23

     B.   Disposition of Executory Contracts and Unexpired Leases .............. 27

     C.   Revesting of Assets; Release of Liens .............................................. 28

IX.   POST-CONSUMMATION CORPORATE STRUCTURE, MANAGEMENT,
       AND OPERATION, DISCHARGE INJUNCTIONS, AND RELEASES ....... 29

     A.   Continued Corporate Existence ........................................................ 29

     B.   Post-Consummation Governance Documents .................................... 29

     C.   Officers and Directors of Reorganized Debtor .................................. 29

     D.   Corporate Action ............................................................................. 29

X.    PREFERENCES, FRAUDULENT CONVEYANCES AND OTHER CAUSES
       OF ACTIONS ................................................................................. 31

XI.   RISK FACTORS TO BE CONSIDERED ........................................... 32

     A.   General Bankruptcy Risk Factors ..................................................... 32

     B.   Uncertainty of Projections ................................................................ 33

XII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN . 34

|  | A. | General | 34 |
|  | B. | Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests | 34 |
|  | C. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor | 35 |
|  | D. | Backup Withholding and Reporting | 35 |
|  | E. | IRS Circular 230 Notice | 36 |
| XIII. | FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS | | 36 |
|  | A. | Feasibility of the Plan | 36 |
|  | B. | Liquidation Analysis | 36 |
| XIV. | | SUMMARY, RECOMMENDATION, AND CONCLUSION | 38 |

# I. PRELIMINARY STATEMENT

This Disclosure Statement is submitted by Hubbard Properties, LLC ("Hubbard" or "Debtor") pursuant to Section 1125 of the Bankruptcy Code in connection with the *Amended Plan of Reorganization of Hubbard Properties, LLC*, dated as of November 15, 2011 (as amended, the "Plan"), proposed by the Debtor in its efforts to reorganize under Chapter 11 of the Bankruptcy Code. A copy of the Plan is attached as **Exhibit "A."** For purposes hereof, all capitalized terms used in this Disclosure Statement, and not otherwise separately defined herein, shall have the same meanings as such terms have in the Plan. Such meanings shall be equally applicable to both the singular and plural forms of such terms.

# II. PURPOSE OF THE DISCLOSURE STATEMENT

This Disclosure Statement sets forth certain information regarding the Debtor's (a) pre-petition and post-petition operating and financial history, (b) its reasons for seeking protection and reorganization under Chapter 11, (c) significant events that have occurred and steps taken during the Chapter 11 case to facilitate the Debtor's reorganization, (d) the projections reflecting the Debtor's anticipated operations and financing upon its successful emergence from Chapter 11 to show how the Plan may be consummated, (e) a "liquidation analysis" demonstrating the recoveries if the Debtor were liquidated rather than reorganized, (f) various possible Federal tax consequences, and (g) estimates of the total administrative costs and expenses that may be incurred in connection with the Chapter 11 case. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, procedures for resolutions of Claims against the Debtor, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Pursuant to Section 1125 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017, the Bankruptcy Court will hold a hearing to consider this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical reasonable investor typical of the Holders of Claims and Equity Interests in the Classes entitled to vote pursuant to the Plan to make an informed judgment whether to accept or reject the Plan and any objections to this Disclosure Statement. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. IF THE BANKRUPTCY COURT APPROVES THE DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION," THE BANKRUPTCY COURT WILL ENTER AN ORDER APPROVING THE DISCLOSURE STATEMENT, SCHEDULING A CONFIRMATION HEARING, AND SETTING VARIOUS DEADLINES (THE "DISCLOSURE STATEMENT ORDER").**

**NO STATEMENT OR INFORMATION CONCERNING THE DEBTOR (PARTICULARLY AS TO FUTURE BUSINESS, RESULTS OF OPERATIONS OR FINANCIAL CONDITION, OR WITH RESPECT TO DISTRIBUTIONS TO BE MADE UNDER THE PLAN) OR ANY OF ITS ASSETS, PROPERTY, OR BUSINESS THAT IS**

GIVEN FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN IS AUTHORIZED, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE STATEMENTS AND THE FINANCIAL INFORMATION OF THE DEBTOR, INCLUDING ALL FINANCIAL PROJECTIONS AND INFORMATION REGARDING CLAIMS OR EQUITY INTERESTS CONTAINED HEREIN, HAVE BEEN PREPARED FROM DOCUMENTS AND INFORMATION PREPARED BY THE DEBTOR OR PROVIDED TO THE DEBTOR'S PROFESSIONALS BY THE DEBTOR. THE DEBTOR HAS NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY OR COMPLETENESS OF SUCH STATEMENTS AND INFORMATION AND EXPRESSLY DISCLAIMS ANY REPRESENTATION CONCERNING THE ACCURACY OR COMPLETENESS THEREOF.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN INFERENCE THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED EVIDENCE OF THE TAX OR OTHER LEGAL CONSEQUENCES OR EFFECTS OF THE REORGANIZATION OF THE DEBTOR. CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BY ITS NATURE, IS A FORECAST OF FUTURE EVENTS AND, THEREFORE, INCLUDES ESTIMATES, ASSUMPTIONS, AND PROJECTIONS WHICH MAY PROVE TO BE WRONG, OR WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT SUCH HOLDER'S ATTORNEY AND ACCOUNTANT AS TO THE EFFECT OF THE PLAN ON SUCH HOLDER, INCLUDING, BUT NOT LIMITED TO, THE TAX EFFECTS OF THE PLAN.

IT IS OF THE UTMOST IMPORTANCE TO THE DEBTOR THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN BY COMPLETING AND SIGNING THE BALLOT ENCLOSED HEREWITH AND FILING IT WITH THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, 801 NORTH FLORIDA AVENUE, TAMPA, FLORIDA 33602, <u>ON OR BEFORE 4:00 P.M. EASTERN TIME ON _____, 2011.</u>

**THE DEBTOR BELIEVES THAT IT IS IN THE BEST INTERESTS OF ALL PARTIES TO VOTE TO ACCEPT THE PLAN BECAUSE THE PLAN FAIRLY AND EQUITABLY TREATS ALL HOLDERS OF CLAIMS BY PROVIDING THE EARLIEST POSSIBLE AND MAXIMUM RECOVERY TO SUCH HOLDERS.**

## III.   THE CHAPTER 11 PROCESS

### A.   Explanation of the Reorganization Process.

Chapter 11 of the Bankruptcy Code contemplates the formulation of a plan of reorganization and outlines how a debtor's debts will be paid.  Unlike cases under Chapter 7, 12, or 13 of the Bankruptcy Code, a trustee is not ordinarily appointed in a Chapter 11 case.  Instead, the debtor remains in control of its assets and business affairs as a "debtor-in-possession" with most of the powers and duties of a trustee.  In addition to statutory requirements relating to plan formulation, confirmation, and post-confirmation matters, a Chapter 11 case is also shaped by statutory prohibitions against collection efforts or enforcement actions by creditors in order to allow the debtor breathing space within which to reorganize.  The Bankruptcy Code contains a number of other significant provisions applicable to Chapter 11 cases, such as those relating to post-petition financing and pre-petition executory contracts, which confer powers on the debtor-in-possession and also provides creditors with certain rights and remedies.

Formulation of a plan of reorganization is the principal purpose of a Chapter 11 case.  A plan of reorganization sets forth the means by which claims against, and interests in, the debtor will be satisfied.  After a plan of reorganization has been filed, it must be accepted by holders of claims against, or interests in, the debtor.  Section 1125 of the Bankruptcy Code requires full disclosure before solicitation of acceptances of a plan of reorganization.  This Disclosure Statement is presented to Holders of Claims and Equity Interests to satisfy the disclosure requirements of Section 1125 of the Bankruptcy Code.

### B.   Voting Procedures.

(1)   Persons Entitled to Vote.  Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Equity Interests that are Impaired under the terms and provisions of the Plan are entitled to vote to accept or reject the Plan.  Furthermore, if a Class of Claims or Equity Interests is not entitled to receive any Distribution under the Plan, such Class is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Holders of Disputed Claims are not entitled to vote on the Plan unless the Bankruptcy Court, upon motion of such Holder, temporarily allows the Claim in the Estimated Amount defined by the Court for purposes of voting to accept or reject the Plan.

(2)   Voting Instructions.

(i)   **Ballots**.  In voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement.  If you have Claims or Equity Interests in more than one Class, you may receive multiple ballots.  **IF YOU RECEIVE MORE THAN ONE BALLOT, YOU SHOULD ASSUME THAT EACH BALLOT IS FOR A**

**SEPARATE CLAIM OR EQUITY INTEREST AND YOU SHOULD COMPLETE AND RETURN ALL BALLOTS.**

    (ii) **Returning Ballots**. **YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND FILE IT WITH THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, 801 NORTH FLORIDA AVENUE, TAMPA, FLORIDA 33602, <u>ON OR BEFORE 4:00 P.M., EASTERN TIME ON _____, 2011</u>. IN ORDER TO BE COUNTED, BALLOTS MUST BE FILED WITH THE BANKRUPTCY COURT ON OR BEFORE THAT TIME.**

    **IT IS OF THE UTMOST IMPORTANCE TO THE DEBTOR THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.**

    (iii) **Incomplete or Irregular Ballots**. Ballots which fail to designate the Class to which they apply shall be counted, subject only to contrary determinations by the Bankruptcy Court, in the Class determined by the Debtor. **BALLOTS THAT ARE NOT SIGNED AND BALLOTS THAT ARE SIGNED BUT NOT EXPRESSLY VOTED EITHER FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

**C.** **<u>Confirmation</u>**.

    (1) <u>Confirmation Requirements</u>. For a Debtor's Plan to be confirmed, Chapter 11 requires that a requisite number of votes be cast in favor of the Plan. However, Chapter 11 does not require that every Holder of a Claim or Equity Interest vote in favor of the Plan for it to be confirmed by the Bankruptcy Court. For any Class of Impaired Claims to accept the Plan, Section 1126(c) of the Bankruptcy Code requires that claimants who hold a majority in number and at least two-thirds (2/3) in the amount of the Allowed Claims in such Class that actually vote on the Plan must vote to accept the Plan. For a Class of impaired Equity Interests to accept the Plan, Section 1126(d) of the Bankruptcy Code requires that Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class that actually vote on the Plan must vote to accept the Plan.

    Even if all Classes of Claims and Equity Interests accept the Plan, Section 1129 of the Bankruptcy Code requires that the Bankruptcy Court find, among other things, that the Plan is in the best interests of Holders of Claims and Equity Interests. Section 1129 generally requires that the value to be distributed to Holders of Claims and Equity Interests may not be less than such parties would receive if the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code.

    (2) <u>Cramdown</u>. Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even though less than all of the Classes of Claims and Equity Interests accept it. Confirmation of the Plan over the objection of one or more Impaired Classes of Claims or Equity Interests is generally referred to as a "cramdown." For the Plan to be confirmed over the objection of an Impaired Class of Claims or Equity Interests, the Debtor must show that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

(3) <u>Confirmation Hearing</u>. Upon approval of the Disclosure Statement, the Bankruptcy Court will set a Confirmation Hearing with respect to the Plan. Each party in interest will receive, either with this Disclosure Statement or separately, the Bankruptcy Court's notice of the hearing on Confirmation of the Plan. The Confirmation Hearing may be adjourned, from time to time, by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

(4) <u>Feasibility of the Plan</u>. The terms proposed by the Debtor for the treatment of Allowed Claims and Allowed Equity Interests under the Plan are based upon, among other things, the assessment by the Debtor of the relative priority afforded to various Claims and Equity Interests under the Bankruptcy Code and the Debtor's ability to repay each of the obligations consistent with the capital requirements of Reorganized Debtor's business. **WHILE THERE CAN BE NO ASSURANCE THAT THE PLAN, IF CONFIRMED, WILL BE SUCCESSFUL, THE DEBTOR BELIEVES THAT REORGANIZATION UNDER THE PLAN DOES PROVIDE FOR THE GREATEST AND EARLIEST RECOVERIES FOR ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS.**

(5) <u>Effect of Confirmation</u>. Confirmation makes the Plan binding upon the Debtor, all Holders of Claims and Equity Interests and other parties in interest, regardless of whether or not it has been accepted by them.

**D.     <u>Procedure for Filing Proofs of Claim and Proofs of Interest</u>.**

(1)     <u>Bar Dates</u>.

(i)     **General Bar Date for Claims**. All Proofs of Claim must have been filed by the close of business on April 12, 2011 (the "<u>General Claims Bar Date</u>"). **IF A CLAIM WAS LISTED IN THE SCHEDULES FILED BY THE DEBTOR AND NOT DESIGNATED AS CONTINGENT, UNLIQUIDATED, OR DISPUTED, A PROOF OF CLAIM NEED NOT HAVE BEEN FILED.** Both the Schedules and the registers listing Proofs of Claim that were filed on or before the General Claims Bar Date are on file at the Bankruptcy Court and are open for inspection during regular Bankruptcy Court hours.

(ii)     **Administrative Claims Bar Date**. Unless otherwise ordered by separate order of the Bankruptcy Court, the Disclosure Statement Order will establish a bar date or deadline for the filing of all Applications for Allowance ("<u>Administrative Claims Bar Date</u>"). Administrative Expense Claims arising after the Administrative Claims Bar Date shall be filed within thirty (30) days of the date of entry of an order confirming the Plan (the "<u>Confirmation Order</u>").

(iii)     **Administrative Expense Claims**. Unless otherwise ordered by the Bankruptcy Court, the notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(f) and 3020(c) will set forth such date and constitute notice of the Administrative Claims Bar Date. The Reorganized Debtor and any other party in interest will have approximately thirty (30) days after the Administrative Claims Bar Date to review and object to such Administrative Expense Claims before a hearing for determination of such Claims is held by the Bankruptcy Court.

(2)     Executory Contracts and Unexpired Leases.  Unless otherwise ordered by separate order of the Bankruptcy Court, parties to executory contracts or unexpired leases that are rejected by the Debtor under the Plan must file any Claims for damages resulting from such rejection within thirty (30) calendar days after the Confirmation Date.  Parties to executory contracts or unexpired leases that were or may be rejected by the Debtor by motion or otherwise before Confirmation must file Proofs of Claim for any rejection damages in accordance with the Bankruptcy Court's Order with respect to such rejection.

## IV.     INFORMATION REGARDING THE DEBTOR

### A.     Overview and History of the Debtor.

The Debtor is a Florida limited liability company that owns and operates a retail and entertainment complex located in Madeira Beach, Florida, commonly known as the John's Pass Boardwalk (the "Property").  The Property consists of approximately 39,862 square feet of retail space located in five buildings and a 322-car parking garage.  Portions of the Property are currently leased to (i) Florida Fisherman, Inc.; (ii) Florida Paw Paws, Inc.; (iii) Caribongo, LLC; (iv) Butterfield Bros., LLC d/b/a Kilwin's of John's Pass; (v) Natural Comfort Footwear, Inc. d/b/a Florida Footwear; (vi) Myorleans, LLC d/b/a Addicted to the Bean; (vii) Friendly Fisherman Restaurant; (viii) Nagasti, Inc. d/b/a Gray Jewelers; (ix) Hooter's of John's Pass; (x) Bubba Gump Shrimp Co. Restaurants, Inc.; and (xi) Pier Aquarium, Inc. d/b/a Secrets of the Sea Marine Exploration Center and Aquarium (collectively, the "Tenants").

The Debtor acquired the Property from an affiliated entity, Hubbard Enterprises, Inc. in 2004 in connection with a $20,000,000 redevelopment project that substantially rebuilt the Hubbard family's properties located at John's Pass Village in Madeira Beach (the "Redevelopment").  The Hubbard family has owned and operated the Property and related businesses including a marina and the Friendly Fisherman Restaurant since 1976.  The Redevelopment that was completed in 2008 included the construction of a parking garage, new restaurants, and retail space.

The Debtor has nine members: Lorraine W. Hubbard, Lorraine W. Hubbard as Trustee of the Wilson M. Hubbard Trust (the "Trust"), Patricia Hubbard, Kathleen H. McDole, Michael E. Hubbard, Mark F. Hubbard, Jeffrey W. Hubbard, Thomas C. Hubbard, and Jacqueline M. Hubbard (the "Members").

### B.     Debt Structure.

The Redevelopment was financed from loans from the Members and related entities and an initial $16,500,000 construction loan (the "Redevelopment Debt") from Bank of America, N.A. ("BoA"), which refinanced an existing mortgage loan and funded various construction costs and significant equity contributions by the Debtor's Members and affiliates.[1]  To the Debtor's best

---

[1] The total Redevelopment Debt amount was ultimately increased to a principal amount of $23,457,759 through future advances made by BoA and its successors during the Redevelopment process.  The ownership of the Redevelopment Debt has purportedly been assigned through various assignments and allonges from BoA to Transamerica Financial Life Insurance Company ("Transamerica") to IWA.

information, the Redevelopment Debt is now held by IWA. The Redevelopment Debt is secured by a mortgage on the Property and an assignment of rents and related security interests. Since October of 2007, the Redevelopment Debt has been serviced by AEGON USA Realty Advisors, Inc. ("Aegon") who has acted as the lender's agent for virtually all purposes, including with respect to management decisions relating to the Property.[2]

IWA claims that the principal amount owed under the Redevelopment Debt is approximately $28,404,980.15 secured by mortgages and security interests in the Property. The principal balance owed under the latest loan documents and *Second Amended and Restated Renewal Secured Promissory Note* dated May 1, 2008 is $22,605,044.71. IWA claims additional amounts are owed for accrued interest, late charges, fees, pre-payment penalties, and other costs or advances which the Debtor disputes.

The Debtor also owes (i) an unsecured debt to James M. Madden of approximately $270,000, (ii) a debt to Lorraine Hubbard of $400,000, and (iii) a debt to the Trust of approximately $200,000, all for principal loans made in connection with the Redevelopment. In addition, the Debtor further owes Nagasti, Inc. d/b/a Gray Jewelers and Butterfield Bros., LLC d/b/a Kilwin's of John's Pass $15,000 each secured by a pledge of recovery from the BP claim and rights of set-off.

As of the date of this Disclosure Statement, the only Claims filed asserting priority under Section 507(a) of the Bankruptcy Code are Claims for certain leasing commissions to the extent such commissions were earned within the 180 days prior to the Petition Date and would not exceed $24,000 in the aggregate. The Debtor disputes the priority status of those Claims.

Subject to further review, the amounts allegedly owed to various classes of Unsecured Creditors (excluding Administrative, Convenience, Priority, and the IWA Deficiency Claim but inclusive of Claims asserted by affiliates of the Debtor who may be insiders) as of the date of this Disclosure Statement is approximately $1,799,629.70. The portion of that amount owed to non-affiliates of the Debtor is estimated at approximately $1,200,000.

## C.  <u>Reasons for Filing Chapter 11</u>.

Several factors precipitated the Debtor's need for relief under Chapter 11 of the Bankruptcy Code, including a general contraction of the Debtor's business. The Debtor believed that Chapter 11 relief was necessary in order to reorganize its business and financial affairs on terms satisfactory to IWA and other Creditors. As explained below, the Debtor's management determined that bankruptcy protection was necessary to preserve the going concern value of the Debtor's business for the benefit of all of its Creditors.

The Debtor completed the Redevelopment in the summer of 2008. In December 2008, Aegon provided the Debtor with a Notice of Default and Intent to Accelerate based on an alleged payment default for November 2008. In January 2009, Transamerica, through Aegon, sent notification to the Debtor and all of the Tenants of a "Revocation" of the Debtor's "License" to

---

[2] On information and belief, IWA, Transamerica, and Aegon are all affiliates of AEGON, NA, a Netherlands based company that owns Transamerica.

collect rents derived from the Property (the "<u>Notice of Revocation</u>"). Following the issuance of the Notice of Revocation, substantial "workout" negotiations ensued, conducted almost exclusively between the Debtor and Aegon.

While the workout negotiations were never finally memorialized in a written document or loan modification, as part of the negotiations Aegon demanded that (i) the Debtor dismantle its existing property management office and employ a property manager selected by and acceptable to Aegon and (ii) that all rents, lease payments, and other income collected from operators at the Property (the "<u>Collateral</u>") be deposited into a lockbox account at Bank of America exclusively controlled by Aegon ("<u>Lockbox</u>"). The Debtor believed the Lockbox was to be a segregated account containing only the Debtor's funds and that all receipts and disbursements would be strictly accounted for. From the Lockbox, Aegon would allow certain funds to be used to pay those expenses that Aegon determined were necessary to preserve and maintain its collateral. As a result, the Debtor hired Commercial Florida Management, LLC ("<u>CFM</u>") as property manager for the Property effective as of February 19, 2009. Since that time, CFM has managed the day-to-day operations of the Property and, with Aegon's permission, has paid the operating expenses of the Property from the Collateral deposited into the Lockbox.[3] The Debtor, primarily through Patricia Hubbard, is responsible for the leasing and tenant relations process.

Neither Transamerica, Aegon, nor IWA took further formal action for almost twenty months, until September 7, 2010, when Aegon sent the Debtor an Acceleration Notice declaring the entire Redevelopment Debt due and payable. During this time period, Aegon exercised virtually exclusive control over all of the Debtor's rents and income and had final authority over the payment of expenses. Unbeknownst to the Debtor (or CFM), Aegon even paid the 2010 property taxes on the Debtor's property prior to those taxes being actually due, apparently from the Debtor's funds, and may have made other unauthorized and unreported disbursements of the Debtor's monies, including various "sundry advances" to pay the Lender's legal fees. No order transferring ownership of the Collateral from the Debtor to Aegon or IWA or requiring the deposit of any rents has been entered. The Debtor has subsequently determined that there was no segregated Lockbox and that the Debtor's funds were being commingled and disbursed by Aegon from a general Aegon account.

On November 12, 2010, IWA filed an action in the Circuit Court for Pinellas County seeking to foreclose the first mortgage on the Property and subsequently sought to appoint a receiver for the Property.[4] One of the events of default claimed by Aegon was the Debtor's

---

[3] While CFM received a report as to rents and income collected and expenses that Aegon allows to be paid, the Debtor still remains uncertain as to the disposition of the other funds in the Lockbox reported as various times as being between $200,000 and $600,000. The Debtor has requested that counsel for IWA provide the bank statements reflecting all deposits into and disbursements from the Lockbox, including any amounts paid to or applied by Lender on account of the Redevelopment Debt.

[4] IWA also sued Lorraine Hubbard, the matriarch of the Hubbard family on a "Carve Out" Guaranty relating to an alleged failure of the Debtor to pay property taxes notwithstanding Aegon's virtually exclusive control over the Debtor's rents and income and that property taxes on the Property have been paid. IWA has subsequently amended its lawsuit against Lorraine Hubbard to assert the full amount of its claim against Lorraine Hubbard is due as a result of the Debtor's filing of its chapter 11 case.

failure to pay the 2010 property taxes, which had been or were immediately thereafter actually paid by Aegon from the Debtor's funds that had been deposited in the so-called Lockbox. A hearing to consider the appointment of the receiver was scheduled for January 27, 2011 at 10:00 a.m. and was stayed by the commencement of this case.

**D.** **Significant Events in the Reorganization Case**.

On the Petition Date, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has operated its business and managed its assets as debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code. To ensure the continuation of normal business operations and preserve the value of the business, the Bankruptcy Court authorized the Debtor to continue its business activities.

The Debtor filed several papers with the Bankruptcy Court seeking relief through what are often termed "first day motions." First day motions are generally intended to ease and facilitate the transition between a debtor's pre-petition and post-petition business operations. These motions are essentially designed to allow certain normal business practices and provide for smoother administration of the Bankruptcy Case but require the prior approval of the Bankruptcy Court. The first day motions filed and orders obtained in the Chapter 11 Case were typical of orders entered in business reorganization cases in this jurisdiction, and requested and authorized, among other things:

- the use of property that may be "Cash Collateral";

- the authorization to enter into various lease agreements with current tenants and/or new tenants;

- the employment of general bankruptcy counsel;

- the resolution of various utility deposit issues.

The Debtor also sought authority to employ CFM n/k/a Grubb & Ellis Management Services ("G&E") under the terms of the existing property management agreement;[5]

In addition to the foregoing, several events have occurred since the commencement of this case that the Debtor believes will have a significant positive impact on its reorganization efforts. The first was the opening of Hooters of John's Pass, Inc. ("Hooters") at the Debtor's Property in February of 2011. Hooters' opening has already had a significant impact on the Debtor's financial performance and, in particular, with respect to parking revenue. The Debtor also negotiated and obtained the approval of the Bankruptcy Court for a new lease with Pier Aquarium, Inc. d/b/a Marine Discovery Center (the "Discovery Center Lease") for the lease of the remainder of the Debtor's retail space, which will result in a one hundred percent (100%) occupancy rate. The Discovery Center Lease contemplates a state-of-the-art marine research,

---

[5] This application has been subsequently withdrawn and denied without prejudice due to certain issues relating to a pre-petition claim asserted by G&E and questions regarding G&E's "disinterestedness" based on its existing relationships with Aegon and Aegon's affiliates.

innovation, and technology exhibit that will increase the visibility and draw of the Debtor's Property as a shopping, dining, and entertainment destination. In connection with the Discovery Center Lease, the Debtor has committed $250,000 in tenant build-out costs, of which approximately $55,000 has already been paid.

Since the commencement of the case, the Debtor also has negotiated and obtained approval of a new submerged land lease to replace its prior lease of submerged lands that expired under its prior terms. This new submerged land lease will provide additional future revenue opportunities, including expanded docking revenues. The additional revenues resulting from the expanded docks are anticipated to fully commence in 2013 and have been factored into the Debtor's pro forma financial projections used to formulate this Plan.

## E. The SARE Issues

Within a week of the Petition Date, IWA filed a motion alleging that the Bankruptcy Court should treat the Debtor's chapter 11 case as a "single asset real estate" case (the "SARE Motion") pursuant to Section 101(51B) and related provisions of the Bankruptcy Code (the "SARE Provisions"). The SARE Provisions, if applicable, impose additional burdens and requirements on a chapter 11 debtor and are generally considered advantages to the secured creditors. The SARE Provisions contemplate a shortened time for a SARE debtor to file a chapter 11 Plan that "has a reasonable possibility of being confirmed within a reasonable time" or requires the debtor to make monthly interest payments to the secured creditor at the non-default contract rate based on the value of the property that is subject to the creditor's lien as determined by the Bankruptcy Court.

The Debtor contends that it is not subject to the SARE Provisions of the Bankruptcy Code because (i) the Property, with five separate buildings, a marina, public parking facilities, retail shops, restaurants, and other amenities does not constitute "a single property or project"; (ii) the Property is a tourist destination, and the Debtor (and its affiliates) actively conduct substantial and varied business activities on the Property, each of which is in addition to the business of "operating the real property and activities incidental"; and (iii) the Debtor has historically received (and in some cases continues to receive) substantial gross revenues from sources other than just passively collecting rental income related to the Property. Significantly, the Debtor operates a parking lot for the general use of visitors to the John's Pass Boardwalk, leases the buildings to different entities which operate a variety of businesses on the premises, and has a portion of the Property geared towards marina based business activities. *See In re The McGreals*, 201 B.R. 736, 742-43 (Bankr. E.D. Pa. 1996); *In re Philmont Dev. Co.*, 181 B.R. 220 (Bankr. E.D. Pa. 1995). Moreover, the Debtor does not fit the mold of the typical "SARE debtor" that is contemplated in the legislative history underlying Section 101(51B), as the typical debtor targeted by the SARE Provisions is characterized as an entity that owns a single piece of undeveloped land, acquired using a purchase money mortgage from the primary secured lender, with a dearth of other creditors. *See Centofant v. CBJ Dev.,* 202 B.R. 467, 472 n. 7 (B.A.P. 9th Cir. 1996). The Court originally scheduled a final evidentiary hearing on the SARE Motion on March 7, 2011. That hearing was rescheduled by the parties' agreement to May 23, 2011 and the SARE Motion was subsequently withdrawn by IWA.

**F.**     **Appointment of Creditor's Committee**

On May 11, 2011, the United States Trustee has appointed an Official Committee of Unsecured Creditors in the Chapter 11 Case (the "Committee").  The Committee has obtained authority to hire the law firm of Hill, Ward and Henderson, P.A. ("HWH") as counsel.

**G.**     **Employment of Fameco and Shopping Center Group**

On October 13, 2011, the Bankruptcy Court approved the employment of Fameco Management Services Associates, L.P. ("Fameco") as financial advisor to the Debtor and the Shopping Center Group, LLC ("SCG") as property managers to the Debtor.  Since their employment, both Fameco and SCG have worked diligently to assist the Debtor in managing its property and finances and to assist the Debtor in maximizing the value and income potential of its property.  Representatives of Fameco and SCG have met and communicated with IWA representatives and assisted the Debtor and its professionals in developing the financial information and models necessary to the formulation of the Debtor's Plan.  Both Fameco and SCG continue to develop and refine the financial information relating to the Debtor's property and the Debtor may supplement this Disclosure Statement with additional financial information.

**H.**     **Mediation**

On August 17, 2011, representatives of the Debtor, the Committee, and IWA participated in an all-day mediation attempting to resolve the various disputes that have arisen in the Chapter 11 Case.  While the parties were unsuccessful in reaching a global solution, the mediation remains open and the parties continue to exchange information in an effort to reach a consensual resolution.

# V.    SUMMARY AND ANALYSIS OF CLAIMS

## A.    Claims Summary Chart

| POC # | Creditor | Amount Filed or Scheduled | Objection Anticipated | Secured by Collateral [1] | Estimated Value of Collateral [2] | Estimated Allowed Unsecured Claim [3] | Note No. |
|---|---|---|---|---|---|---|---|
| 1. | Pinellas County Tax Collector | $211,112.40 | Y | Y | $15,000,000.00 | $9,000,000.00 | 7 |
| 2. | Pinellas County Tax Collector | $134.13 | N | Y | | $0 | |
| 3. | VanMiddlesworth & Co. | $18,561.00 | N | N | | $18,561.00 | |
| 4. | James M. Madden | $325,993.28 | N | N | | $325,993.28 | 5 |
| 5. | John Schoeller | $450.00 | N | N | | $450.00 | |
| 6. | Commercial Florida Advisors | $8,106.53 | N | N | | $8,106.53 | |
| 7. | Critical System Solution | $1,369.75 | N | N | | $1,369.75 | |
| 8. | SSA Security, Inc. | $32,903.53 | N | N | | $32,903.53 | |
| 9. | General Elevator Sales & Svc | $1,215.00 | N | N | | $1,215.00 | |
| 10 | Quality Building Controls | $250.00 | N | N | | $250.00 | |
| 11 | Broderick & Associates | $64,600.00 | Y | N | | $11,725.00 (P) $13,275.00 (U) | |
| 12 | Highland Products Group, LLC | $4,657.86 | N | N | | $4,657.86 | |
| 13 | Florida Suncoast Tourism | $23,825.00 | N | N | | $23,825.00 | |
| 14 | Walter Dickenson of Tampa Bay, Inc. | $25,000.00 (priority) | N | N | | $11,725.00 (P) $13,275.00 (U) | |
| 15 | Advanced Engineering Systems Corp. | $8,330.60 | N | N | | $8,330.60 | |
| 16 | Bacon & Bacon, P.A. | $30,454.15 | N | N | | $30,454.15 | |
| 17 | Investors Warranty of America, Inc. | $28,404,980.15 | Y | Y | $12,000,000.00 | $12,000,000.00 | 6 |
| 18 | Morris Visitor Publications | $7,745.00 | Y | N | | $4,927.00 | |
| 19 | Butterfield Bros d/b/a Kilwin's | $15,000.00 | N | Y | | $15,000.00 | |
| 20 | Nagasti, Inc. | $15,000.00 | N | Y | | $15,000.00 | |
| 21 | Best Read - Tampa | $8,906.75 | N | N | | $8,906.75 | |
| 22 | CJ Publishers, Inc. | $1,900.00 | N | N | | $0 | 4 |
| 23 | Digital Telecom & Technology | $2,143.42 | N | N | | $2,143.42 | |
| 24 | Door & Hardware Openings | $313.51 | N | N | | $313.51 | |
| 25 | Duncan Seawall | $12,598.31 | N | N | | $12,598.31 | |
| 26 | Florida Detroit Diesel | $5,383.41 | N | N | | $5,383.41 | |
| 27 | Florida Info Guide | $1,500.00 | N | N | | $1,500.00 | |
| 28 | Grainger | $101.00 | N | N | | $0 | 4 |
| 29 | HD Supply Facilities Management | $264.22 | N | N | | $0 | 4 |
| 30 | Home Depot | $258.61 | N | N | | $0 | 4 |
| 31 | Lorraine Hubbard | $400,000.00 | N | N | | $400,000.00 | |
| 32 | Integrated Waste | $1,262.00 | N | N | | $0 | 4 |

| POC # | Creditor | Amount Filed or Scheduled | Objection Anticipated | Secured by Collateral [1] | Estimated Value of Collateral [2] | Estimated Allowed Unsecured Claim [3] | Note No. |
|---|---|---|---|---|---|---|---|
| | Solutions | | | | | | |
| 33 | Jack Rice Insurance | $2,689.64 | N | N | | $0 | 4 |
| 34 | McQuay International | $10,884.78 | N | N | | $10,884.78 | |
| 35 | Ranon, Inc. | $617,500.00 | N | N | | $617,500.00 | |
| 36 | Southern Equipment Service | $22,774.35 | N | N | | $22,774.35 | |
| 37 | Standard Parking Corporation | $403.51 | N | N | | $0 | 4 |
| 38 | TAB Glass & Window Corp. | $191.25 | N | N | | $191.25 | |
| 39 | The Wilson M. Hubbard Trust | $200,000.00 | N | N | | $200,000.00 | |
| | | | | | | | |

Claims Summary Chart Notes:

[1] This column includes whether an asserted claim is secured by collateral owned by the Debtor.

[2] This column includes the Debtor's best estimate of the value of any collateral securing any claim asserted against the Debtor. The estimates of value are given for the purposes of disclosure, in order to assist creditors in determining the amount of unsecured claims that may be ultimately allowed and are not intended to be binding on the Debtor or any creditor.

[3] This column is the Debtor's estimate, given current information, as to the amount of the unsecured claim that may ultimately be allowed in the Debtor's case after determination of any objections to claims and after crediting the estimated value of any collateral securing such claims. These estimates are given without waiver of any specific objection.

[4] The Debtor scheduled these claims based on payables information provided by G&E. The Debtor believes that these claims were paid by checks issued and cleared immediately prior to or subsequent to the Petition Date.

[5] The Debtor is evaluating the Claim to confirm to amounts of unpaid interest that may be due.

[6] This estimate is provided solely to provide creditors with some range of any statutory deficiency claim that may be asserted by IWA pursuant to Section 1111(b)(1) and should not be considered an admission or binding on the Debtor as to the amount of IWA's Claim or the value of the collateral securing IWA's Claim. The Debtor believes IWA's Claim is substantially overstated and subject to reduction, counterclaim, setoff, or equitable subordination. If IWA makes an election under Section 1111(b)(2), IWA will have no Allowed Unsecured Claim.

[7] Tax Collector's assessed value for 2010 was $10,600,000. The Tax Collector's assessed value for 2011 was approximately $11,500,000.00.

## B. The IWA Claim

IWA has filed a proof of claim, asserting a secured claim against the Debtor in the amount of $28,404,980.15. The Debtor disputes the amount of the IWA Claim and believes the amount of IWA's Claim may be subordinated and be subject to significant reduction and offset. The Debtor also believes that IWA, through Aegon, exercised undue influence on the Debtor's business, cash flow, and property operations and may be determined to be an insider as that term is defined under the Bankruptcy Code and that some or all of IWA's Claim interests may be subject to subordination to the claims of other creditors. The Committee has filed an objection to IWA's Claim.

In addition, the IWA Note specifically provides that it is non-recourse as to the Debtor. Therefore, under state law and absent the operation of Section 1111(b) of the Bankruptcy Code, IWA would have no unsecured or deficiency claim against the Debtor. While the IWA Note provides that the IWA Claim may be recourse to the Debtor, if the Debtor filed a voluntary petition for reorganization, the Debtor believes such a provision is an unenforceable ipso facto clause. *See In re Schwegmann Giant Super Markets*, 287 B.R. 649, 657-58 (E.D. La. 2002); *In re Stevens*, 365 B.R. 610, 613 (Bankr. E.D. Va. 2007) (courts interpreting Section 541(c)(1)(b) have applied it to ipso facto clauses in promissory notes, holding that an event of default related to the filing of a bankruptcy petition is an unenforceable ipso facto clause under loan documents).

Because (a) an IWA Deficiency Claim only arises by virtue of Section 1111(b), (b) the Debtor believes IWA will likely be considered an "insider" as that term is defined in Section 101(31) of the Bankruptcy Code, and (c) because significant counterclaims and other grounds for equitable subordination of some or all of IWA's Claim may exist, the Debtor believes the IWA Deficiency Claim can (and perhaps IWA's Claim is different from the other general unsecured claims because a statutory deficiency claim under Section 1111(b) only exists in a chapter 11 case and would not_exist in a chapter 7 case must) be separately classified and treated by the Debtor's Plan from the claims of other general creditors. *In re Woodbrook Assocs.*, 19 F.3d 312, 319 (7th Cir. 1994); *In re SM 014 Ltd.*, 160 B.R. 202, 206-7 n.11 (Bankr. S.D. Fla. 1993); *In re Greenwood Point, LP*, 2011 WL 721549, at *1 (Bankr. S.D. Ind. Feb. 4, 2011).

## C.  Bifurcation of IWA's Claim

Pursuant to Section 506(a) of the Bankruptcy Code, a claims is a "secured claim" to "the extent of the value of such creditor's interest in the estate's interest in such property" and is an unsecured claim "to the extent that the value of such creditor's interest . . . is less than the value of such allowed claim." In other words, a claim is a secured claim to the extent of the value of the collateral securing the claim and is an unsecured claim as to the remainder. The ultimate value of a secured creditor's collateral is typically agreed between the Debtor and a creditor or determined by the Bankruptcy Court in a contested proceeding. The Debtor believes that the value of the collateral securing IWA's claim was approximately $12,000,000 as of the Petition Date. The Debtor believes that based on its improve financial performance, new tenants, and anticipated future revenues that the value of the collateral securing IWA's Claim could have a value range between $15,000,000 and $19,500,000 as of the Effective Date based on projected "stabilized income" that is anticipated in 2016. Accordingly, the Debtor has utilized that range of value in anticipating the amount of the IWA Secured Claim in preparing its Projections and formulating its Plan. The remainder of the Allowed IWA Claim, if any, would be treated as an unsecured claim, subject to IWA making an election pursuant to Section 1111(b) of the Bankruptcy Code, as discussed below.

Pursuant to Section 552(a) of the Bankruptcy Code, the Debtor does not believe that any property acquired by the Debtor subsequent to the Petition Date is collateral for the IWA Claim, other than actual rents derived from real property or leases that was subject to the mortgage held by IWA as of the Petition Date. The Debtor believes that parking income or revenues generated after the Petition Date are not revenues subject to IWA's security interest or lien.

**D.** **The 1111(b) Election**

The Debtor believes that the value of the collateral securing IWA's Claim is less than the amount of the Claim asserted by IWA. Notwithstanding that the IWA Note is non-recourse to the Debtor and that IWA would not have any deficiency claim against the Debtor under state law, pursuant to Section 1111(b)(1) of the Bankruptcy Code, IWA has a statutory deficiency claim that it can assert as an unsecured claim against the Debtor. The Debtor has separately classified this statutory deficiency claim in Class 6 of the Plan. Pursuant to Section 1111(b)(2) of the Bankruptcy Code, however, IWA can elect to have its Claim treated as fully secured up to the full amount of its claim (defined in the Plan as the "IWA Election"). The Plan provides an alternative treatment of IWA's Claim in the event IWA makes the IWA Election.

## VI. HISTORICAL FINANCIAL PERFORMANCE AND FINANCIAL PROJECTIONS

Upon their employment in connection with this Bankruptcy Case, one of the first steps taken by the Debtor's counsel was to work closely with Debtor's management to develop financial models that accurately reflected both (a) the Debtor's pre-petition and post-petition historical financial performance and (b) reasonable projections as to future performance that would form the basis of a proposed Chapter 11 plan of reorganization (collectively, the "Projections"). Since their employment, Fameco and SCG have greatly assisted the Debtor and counsel in developing revised Projections reflecting anticipated future performance. To accomplish that task, the Debtor's management, counsel, and, more recently, Fameco and SCG, have reviewed and summarized historical financial information, including the monthly operating reports filed in connection with the Debtor's Chapter 11 case.[6] The results of those efforts are reflected in the following exhibits to this Disclosure Statement:

o **Composite Exhibit "B"** summarizes the Debtor's pre-petition financial performance for the years 2009 and 2010 (the "Pre-Petition Financial Information"). Included in the Pre-Petition Financial Information for purposes of comparison is the proposed 2011 Budget prepared by G&E in consultation with Aegon which the Debtor believes substantially understated income and overstated expenses particularly by the inclusion of both the 2010 Property Taxes (which has already been paid in November 2010) and the 2011 Property Taxes (which were not due until March of 2012), as well as overstating the expense items;[7]

---

[6] The Debtor initially sought to have G&E assist it in the preparation of the Projections based on its experience with the Debtor's Property and general expertise in such matters. While G&E initially indicated its willingness to do so, it later advised the Debtor it would not be able to render such assistance, presumably due to its other relationships with Aegon. As a result, the Projections attached to the Debtor's initial Disclosure Statement dated April 27, 2011 were developed solely through the efforts of Debtor's management and counsel's staff. The updated Projections filed in connection with this Disclosure Statement reflect both updated information and the insight and input of both Fameco and SCG.

[7] The information contained in Exhibit "B" for 2009 was obtained from the Debtor's 2009 tax return. The information contained in Exhibit "B" for 2010 was derived primarily from reports prepared by G&E and supplemented from information obtained from the Pinellas County Tax Collector with respect to the 2009 and 2010

o **Composite Exhibit "C"** reflecting an Income and Expense Projection for the years 2011 thru 2017. These Projections include the Debtor's best estimates of payments that may be required under the Plan.

The Projections and Claims Summary assume an Effective Date of December 31, 2011. The Projections will likely be supplemented and may be superseded prior to the hearing to consider the adequacy of the Disclosure Statement scheduled for December 16, 2011 as additional information is developed and operating results analyzed.

As indicated in the Projections, the Debtor's continuing operations and payments to be made under the Plan will be funded by (1) Cash on hand on the Effective Date, (2) the Exit Funding, (3) payments to be made under collections from the BP Claim, or (4) Cash generated and/or collected by the Reorganized Debtor in the ordinary course of business on and after the Effective Date. The amount of the Exit Funding is anticipated to be $300,000.

## VII.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

Under the Plan, the Debtor has established the various Classes of Creditors and Equity Interest Holders pursuant to Section 1122 of the Bankruptcy Code. The Plan places the various Claims and Equity Interests in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class or the treatment of such Claims or Equity Interests is substantially similar. In general, the proponent of a Chapter 11 plan has broad discretion to classify Claims and Equity Interests in the plan according to the particular facts and circumstances of each case. In re Holywell Corp., 913 F.2d 873, 880 (11th Cir. 1990). Pursuant to the Bankruptcy Code, the Debtor has not classified Administrative Expense Claims and Priority Tax Claims under the Plan. Holders of other Claims and Equity Interests are classified in the Plan as follows:

| Class | Description | Status | Entitled to Vote |
|-------|-------------|--------|------------------|
| Class 1: | Unsecured Priority Claims | Unimpaired | No |
| Class 2: | Secured Tax Claim of Pinellas County Tax Collector | Unimpaired | No |
| Class 3: | IWA Secured Claim | Impaired | Yes |
| Class 4(A): | Secured Claim of Butterfield | Impaired | Yes |
| Class 4(B): | Secured Claim of Nagasti | Impaired | Yes |

property taxes that were actually paid in 2010 but not disclosed in any information provided to the Debtor by G&E or IWA prior to the Petition Date.

| Class | Description | Status | Entitled to Vote |
|-------|-------------|--------|------------------|
| Class 5: | Administrative Convenience Claims | Impaired | Yes |
| Class 6: | General Unsecured Claims | Impaired | Yes |
| Class 7: | IWA Deficiency Claims | Impaired | Yes |
| Class 8: | Equity Interests | Unimpaired | No |

The Debtor believes these classifications do not discriminate unfairly, that Claims in each Class are substantially similar to each other, that the separate classifications are based on the nature of the respective Claims and Equity Interests, and that they are justified under the Bankruptcy Code and applicable law.

The table below summarizes the classification and treatment of the Claims and Equity Interests under the Plan.

In all Classes, Claimants have the ability to consent to a treatment of their Claim that is different than that proposed under the Plan if such modification does not have a material adverse impact on other Creditor Classes.  Additionally, the Debtor may modify, with the Bankruptcy Court's approval, the treatment currently proposed in the Plan.  Any estimated Claim amounts are calculated as of the date of this Disclosure Statement.  Estimated percentage recoveries are also set forth below for certain Classes of Claims.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows.  The Debtor has not yet fully analyzed all Proofs of Claim filed in the Chapter 11 Case to determine whether the amounts stated in such Proofs of Claim are accurate.  The estimated Claim amounts set forth below are consolidated amounts based upon the Debtor's review of its books and records and of certain Proofs of Claim, and may include estimates of a number of Claims that are contingent, Disputed, and/or unliquidated.

| Class Description | Summary of Treatment Under Plan |
|-------------------|--------------------------------|
| Administrative Expense Claims<br><br>(Estimated at approximately $300,000) | Administrative Expense Claims shall include, among other amounts entitled to administrative status under 11 U.S.C. 503, (i) the costs and expenses incurred in the operation of the business of the Debtor ("OCB Administrative Claims"), (ii) Allowed Claims for reasonable fees and out of pocket expenses of professionals retained in the Reorganization Case with the approval of the Bankruptcy Court, including counsel for Debtor, and Debtor's financial advisors ("Professional Fee Claims"), and (iii) Administrative Expense Claims Allowed under Section 503(b)(9). |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | A. Except as provided below, each Holder of an Administrative Expense Claim shall, in full and final satisfaction of such Allowed Administrative Expense Claim, be paid on the later to occur of (a) the Effective Date or (b) the date on which an Administrative Expense Claim shall become an Allowed Claim: (i) in full, in Cash, the amount of such Allowed Administrative Expense Claim, or (ii) in such other amount and on such other terms and conditions as may be agreed between the Holder of such Administrative Expense Claim and the Debtor.

B. Any timely filed and Allowed Section 503(b)(9) Claim shall be paid (i) in full, in Cash, the amount of such Allowed 503(b)(9) Claim, or (ii) in such other amounts and such other terms and conditions as may be agreed between the Holder of such 503(b)(9) Claim and the Debtor provided that (a) an application for allowance of such 503(b)(9) Claim shall have been filed by the deadline established by the Bankruptcy Court, (b) the amount asserted as a Section 503(b)(9) Claim has not been otherwise paid prior to the Effective Date, and (c) any amounts paid on account of an Allowed 503(b)(9) Claim shall reduce the Allowed amount of any Unsecured Claim asserted by the Holder of the 503(b)(9) Claim.

C. Allowed and uncontested OCB Administrative Claims representing post-petition liabilities shall be paid by the Debtor in the ordinary course of its business in accordance with the terms and conditions of the particular transactions relating thereto during the Reorganization Case as an authorized use of Cash Collateral, pursuant to any Interim and Final Cash Collateral Orders without need for application and allowance under Section 503.


Administrative Expense Claims are not classified and are to be treated in accordance with the Bankruptcy Code and the Holders of Administrative Expense Claims are not entitled to vote on the Plan. |
| DIP Financing Claims | Any DIP Financing Claims shall be paid on the Effective Date from the Exit Cash or as may be otherwise agreed between the Holders of the DIP Financing Claim. |
| Priority Tax Claims

(Estimated at $0.00) | Priority Tax Claims are Claims of Governmental Units for taxes that are not Secured Claims and are entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

Allowed Priority Tax Claims will be paid in full, in Cash, the later of: (a) the Effective Date; (b) the date of the Order allowing such Claim; or (c) the date that such Allowed Priority Tax Claim would have been due if the Reorganization Case had not been commenced; provided, however, that the |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | Debtor may, at its option, in lieu of payment in full of Allowed Priority Tax Claims on the Effective Date, make deferred Cash payments with the principal amount of such Allowed Priority Tax Claims amortized and payable in equal annual installments over five (5) years from the order of relief, and in such case interest shall accrue on the unpaid balance commencing on the Effective Date.

Priority Tax Claims are not classified, are to be treated as required by the Bankruptcy Code, and the Holders of such Claims are not entitled to vote on the Plan. |
| Class 1 – Unsecured Priority Claims

(Estimated at $10,000) | Except as otherwise provided below, each Holder of an Allowed Priority Claim in this Class shall receive, in full satisfaction, settlement, release and discharge thereof, Cash equal to the amount of such Allowed Priority Claim on the later of: (i) the Effective Date or as soon thereafter as practical; or (ii) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Claim (or any other date specified in such Final Order) or as soon thereafter as practical, unless the Holder of an Allowed Priority Claim and the Debtor (or Reorganized Debtor) agree to a less favorable treatment. |
| Class 2 - Secured Tax Claim of Pinellas County Tax Collector | The Allowed Secured Tax Claims of the Pinellas County Tax Collector for real and tangible personal property taxes for 2011 will be paid on or before March 31, 2012. The Debtor reserves all rights to pursue any available challenges to any valuation or assessment available under law upon receipt of the actual trim notice for 2011 taxes. |
| Class 3 – IWA Secured Claim

(Amount estimated between $15,000,000 and $19,000,000 based on possible valuation of collateral) | **Determination of Secured Status.**

The amount of the Allowed IWA Secured Claim shall be equal to the value of the IWA Collateral (a) as stipulated between the Debtor and IWA or (b) as determined by the Bankruptcy Court, pursuant to Section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012 prior to or in conjunction with the Confirmation Hearing.

**Treatment.**

The IWA Secured Claim shall be satisfied through the Debtor's delivery of the IWA Note A and IWA Note B on the Effective Date.

**Material Terms and Conditions of IWA Note A.**

The material terms and conditions of IWA Note A shall be as follows:

    Original Principal Amount: The original principal amount of the IWA Note A shall be calculated as provided in |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | Section 1.62 of the Plan.

Interest Rate: A fixed interest rate equal to (i) the IWA Contract Rate as of the Effective Date through the first Anniversary Date, four percent (4%) per annum through the fifth Anniversary Date and then five and one-quarter percent (5.25%) per annum thereafter.

Payment Term of IWA Note A: The IWA Note A shall provide for monthly payments of interest only for the first 60 months following the Effective Date. Unless the Holder of the IWA Claim makes an 1111(b) election, on the fifth Anniversary Date, any outstanding principal balance remaining on the IWA Note B shall be added to the outstanding principal balance of the IWA Note A and the entire cumulative balance shall be paid through monthly payments of principal and interest thereafter based on a 25-year amortization schedule with a balloon payment of all principal and accrued interest due on the tenth Anniversary Date.

**Material Terms and Conditions of IWA Note B.**

The material terms and conditions of IWA Note B shall be as follows:

Original Principal Amount: The original principal amount of IWA Note B shall be calculated as provided in Section 1.63 of the Plan.

Interest Rate: The IWA Note B shall be a fixed interest rate of 5.25% per annum subject to upward or downward adjustment to the extent that the Bankruptcy Court determines that another fixed interest rate is required to provide that the total deferred cash payments (inclusive of Excess Cash Flow Payments paid to the Holder of the IWA Claim) have a value as of the Effective Date equal to the Allowed Amount of the IWA Secured Claim in the event that the Holder of the IWA Secured Claim does accept the Plan.

Payment of IWA Note B: The IWA Note B shall provide for (i) monthly payments of interest only for the 60 months following the Effective Date, plus any Excess Cash Flow payments made within 20 days of the first through fifth Anniversary Dates, which shall be credited to reduce the principal amount of IWA Note B. Unless the Holder of the IWA Claim makes an 1111(b) election, on the fifth Anniversary Date, the entire outstanding principal balance of IWA Note B shall be added to the principal balance of IWA Note A and paid as provided in Section 4.3.3 above.

**Liens**. |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | IWA shall retain any Liens(s) on the IWA Collateral securing the IWA Claim, up to the Allowed amount of the IWA Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code. **1111(b) Election**. In the event IWA makes a valid and timely IWA Election, then the terms of IWA Note B shall be modified so that (i) the original principal balance of IWA Note B shall be the amount that is equal to the difference between (a) the Allowed Amount of the Allowed IWA Claim, as determined by the Bankruptcy Court subject to all objections, setoffs, and counterclaims as provided in Section 4.3.7 below and (b) the original principal amount of IWA Note A; (ii) the monthly and Excess Cash Flow payments that would otherwise be applied to interest and principal on IWA Note B will be applied exclusively to principal; (iii) the IWA Note B shall not bear interest; and (iv) the payment term of IWA Note B will be extended until the principal balance of IWA Note B is paid in full. In the event IWA makes a timely IWA Election, in addition to the modifications to IWA Note A described in the preceding paragraph, the interest rate payable on IWA Note A will be reduced so that the sum of the total cumulative deferred cash payments received by the Holder of the IWA Claim under the terms of IWA Note A and IWA Note B equals the total amount of the Allowed IWA Claim and has a value, as of the Effective Date, that is equal to the value of the IWA Collateral on the Effective Date as determined by the Bankruptcy Court or pursuant to agreement between the Debtor and IWA. **Conditional Release of IWA**. **In the event the Plan is confirmed pursuant to Section 1129(a) of the Bankruptcy Code with the acceptance of the Plan by the affirmative vote(s) of the Holder of the IWA Claim in and with respect to all impaired classes in which the Holder of the IWA Claim is or may be entitled to vote to accept or reject the Plan, then the confirmation of the Plan and entry of the Confirmation Order shall be deemed a compromise and release by the Debtor of any and all claims against IWA, Aegon, and their affiliates as more fully described in Section 6.5 of the Plan. In the event the Holder of the IWA Claim objects to or does not accept the Plan by the affirmative vote(s) in and with respect to all Impaired Classes in which the Holder of the IWA Claim is or may be entitled to vote, then confirmation of the Plan shall not constitute a release or compromise of any claim** |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | of or by the Debtor, the Reorganized Debtor, and any party claiming by or through the Debtor or the Reorganized Debtor against IWA, Aegon, and their Affiliates and such claims shall be retained and may be enforced to the full extent provided under Section 6.4 of the Plan and may be brought by the Debtor or Reorganized Debtor in any action or proceeding in a court of competent jurisdiction including, without limitation, in connection with any objection to the IWA Claim or adversary proceeding seeking the subordination for purposes of distribution or otherwise of some or all of the IWA Claim pursuant to Section 510 of the Bankruptcy Code or other applicable law. |
| Class 4(A) – Claim of Butterfield Bros., LLC<br><br>(Estimated at $15,000) | The Allowed Class 4(A) Secured Claim of Butterfield Bros., LLC shall be paid within 30 days of receipt of the BP Claim Proceeds from the BP Claim Proceeds with interest accruing at the Prime Rate effective as of the date of payment. Butterfield shall retain its rights to setoff of the amount of the Class 4(A) Claim at a rate of $1,000 per month from the rent to be paid by Nagasti pursuant to its Lease with the Debtor in the event the BP Claim Proceeds are not received by the first Anniversary Date. |
| Class 4(B) - Claim of Nagasti, Inc.<br><br>(Estimated at $15,000) | The Allowed Class 4(B) Secured Claim of Nagasti, Inc. shall be paid within 30 days of receipt of the BP Claim Proceeds from the BP Claim Proceeds with interest accruing at the Prime Rate effective as of the date of payment. Nagasti shall retain its rights to setoff of the amount of the Class 4(B) Claim at a rate of $1,000 per month from the rent to be paid by Nagasti pursuant to its Lease with the Debtor in the event the BP Claim Proceeds are not received by the first Anniversary Date. |
| Class 5 – Administrative Convenience Claims<br><br>(Estimated at $5,000.00) | The Reorganized Debtor shall pay the Holders of Allowed Administrative Convenience Class Claims Cash equal to fifty percent (50%) of their Allowed Class 5 Claim within thirty (30) days after the Effective Date in full satisfaction of claims. |
| Class 6 - General Unsecured Claims<br><br>(Estimated at $800,000.00)<br><br>(Non-Affiliated General Unsecured Claims estimated at approximately $1,200,000. | Holders of Allowed Class 6 Unsecured Claims (excluding Holders of Allowed Class 6 Unsecured Claims that are Affiliates of the Debtor) shall receive a payment within ten (10) Business Days of the Effective Date of eight percent (8%) of such Holder's Allowed Class 6 Unsecured Claim. Within 30 days of the Debtor's receipt of the BP Claim Proceeds, the Holders of Allowed Class 6 Claims will receive an additional distribution equal to such Holder's Pro-Rata share of forty percent (40%) of the BP Claim Proceeds.<br><br>**Calculation of Pro Rata Share**.<br><br>In calculating the Pro Rata Share of the portion of the BP Claim Proceeds to be paid to the Holder of an Allowed Class |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | 6 Unsecured Claim, such Pro Rata Share shall be based on a fraction, the numerator of which shall be the Allowed amount of such Holder's Class 6 Claim and the denominator of which shall be the total amount of Allowed Class 6 Claims. |
| Class 7: IWA Deficiency Claims<br><br>(Estimated at range of $3,000,000 - $7,500,000 prior to setoff, offset, objection, or counterclaim) | In the event that IWA does not make the IWA Election, any IWA Deficiency Claim (after determination of all applicable setoffs, offsets, or subordination pursuant to Section 510 of the Bankruptcy Code or other applicable law to the extent IWA does not accept the Plan) will be paid in annual installments equal to the Excess Cash Flow Payment with the first payment to be made on the sixth Anniversary Date of the Effective and continuing on the Anniversary Date of each succeeding year until the earlier of (a) the date that the Allowed IWA Deficiency Claim is paid in full or (b) June 30, 2021. |
| Class 8 – Equity Interests | All existing Equity Interests in the Debtor shall be cancelled as of the Effective Date and new membership interests representing one hundred percent (100%) of the membership interests in the Reorganized Debtor shall be issued to persons or entities that provided the Exit Funding. |

The amount of Allowed Administrative Claims that must be paid prior to or on the Effective Date could vary significantly depending on a number of factors, including the duration of this Bankruptcy Case. Unsecured Claims shall be calculated in amounts estimated as of the Petition Date. For other Claims, the calculation date is not necessarily the Effective Date of the Plan. The Effective Date will occur after the Confirmation Date, when the conditions precedent to the occurrence of the Effective Date are satisfied.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AND EQUITY INTERESTS AGAINST THE DEBTOR AND THUS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

## VIII.  CLAIMS ALLOWANCE AND PAYMENT, EXECUTORY CONTRACTS, REVESTING OF ASSETS

### A.  Allowed Claims, Distribution Rights, and Objections to Claims.

#### (1)  Allowance Requirement

Only Holders of Allowed Claims are entitled to receive Distributions under the Plan. An Allowed Administrative Expense Claim is all or any portion of an Administrative Expense Claim (a) that has been allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, or (b) that was incurred by the Debtor in the ordinary course of business during the

Chapter 11 Case. A post-petition obligation that is contingent or Disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding Claims arising under workers' compensation law), secondary payor liability, or any other Disputed legal or equitable Claim based on tort, statute, contract, equity or common law, is not considered to be an obligation that is payable in the ordinary course of business.

An Allowed Claim (other than an Administrative Expense Claim) is such Claim or any portion thereof (a) that has been allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, or (b) as to which (i) no Proof of Claim has been filed with the Bankruptcy Court and (ii) the liquidated and non-contingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (c) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court, or (ii) any objection to its allowance has been settled, withdrawn, or denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Plan.

In no event will those Administrative Expense Claims or those other Claims subject to disallowance under Section 502(d) of the Bankruptcy Code be deemed to be Allowed Claims.

## (2)    Interest on Claims; Dividends; Attorneys Fees

The Plan provides that unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest, costs, and attorney's fees will not accrue or be paid on Claims, and no Holder of a Claim will be entitled to interest, costs, or attorneys' fees accruing on or after the Petition Date on any Claim or Equity Interest.

## (3)    Making of Distributions

Reorganized Debtor, shall, following the Effective Date, be responsible for making (or causing to be made) Distributions under the Plan. Unless otherwise ordered by the Court, Distributions to Holders of Allowed Claims will be made by the Reorganized Debtor (a) at the addresses set forth on the Proofs of Claim filed by such Holders, (b) at the addresses reflected in the Schedules if no Proof of Claim has been filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Debtor or the Reorganized Debtor after the date of any related Proof of Claim, or after the date of the Schedules if no Proof of Claim was filed.

If any Holder's Distribution is returned as undeliverable, a reasonable effort will be made to determine the current address of such Holder, but no further Distributions to such Holder will be made unless and until the Reorganized Debtor are notified of such Holder's then current address, at which time all missed Distributions will be made to such Holder, without interest. Unless otherwise agreed by the Reorganized Debtor, amounts with respect to undeliverable

Distributions made by the Reorganized Debtor will be returned to and for the benefit of the Reorganized Debtor.

All Claims for undeliverable Distributions must be made within the later of six (6) months after the Effective Date or six (6) months after Distribution is made to such Holder; after which date all Unclaimed Property will revert to the Reorganized Debtor free of any restrictions thereon and the Claims of any Holder or successor to such Holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

(4)     Means of Cash Payment

The Plan provides that Cash payments made pursuant to the Plan will be in U.S. funds, by the means agreed to by the payor and the payee, including by check, and/or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the payor will determine in its sole discretion. For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency will be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

(5)     Fractional Distributions

The Plan provides that notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

(6)     De Minimis Distributions

The Plan provides that notwithstanding anything to the contrary contained in the Plan, the Reorganized Debtor will not be required to distribute, and will not distribute, Cash to the Holder of any Allowed Claim if the amount of Cash to be distributed on account of such Claim is less than five dollars ($5.00). Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than five dollars ($5.00) will have such Claim discharged and will be forever barred from asserting such Claim against the Debtor, the Reorganized Debtor, or their respective property. Any Cash not distributed pursuant to this provision will be the property of the Reorganized Debtor, free of any Liens, Claims, Equity Interests, or restrictions thereon.

(7)     Reserves for Disputed Claims; Distributions on Account Thereof

No payments or Distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim.

With respect to any Administrative Expense Claim, other than an Administrative Expense Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court or

that was incurred by the Debtor in the ordinary course of business during the Chapter 11 Case, a Disputed Claim is a Claim that is contingent or Disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding Claims arising under workers' compensation law), secondary payor liability, or any other Disputed legal or equitable Claim based on tort, statute, contract, equity, or common law.

With respect to any Claim that is not an Administrative Expense Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court, a Disputed Claim is a Claim: (a) if no Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent, or Disputed; (b) if a Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, as to which a Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court, or which is otherwise Disputed by a Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (c) for which a Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Proof of Claim was not timely or properly filed; (d) for damages based upon the rejection by a Debtor of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed; (e) that is Disputed under the provisions of the Plan; or (f) if not otherwise Allowed, as to which the applicable Claims Objection Deadline has not expired.

The Reorganized Debtor will, on the applicable Distribution Dates, make Distributions on account of any Disputed Claim that has become an Allowed Claim. Such Distributions will be made pursuant to the provisions of the Plan governing the applicable Class. Such Distributions will be based solely upon the amount of the Distributions that would have been made to the Holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

(8)     Objection Procedures

All objections to Claims, other than Claims that are deemed to be Disputed Claims, must be filed and served on the Holders of such Claims by the Claims Objection Deadline. Objections to Claims (other than Administrative Claims), shall be filed on the later of ninety (90) days after the Effective Date, or (b) ninety (90) days after the applicable Proof of Claim is filed. If an objection has not been filed to a Proof of Claim or a scheduled Claim by the Claims Objection Deadline, unless such Proof of Claim asserts a Claim that is deemed to be a Disputed Claim, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been Allowed earlier.

(9)     Estimation of Contingent or Unliquidated Claims

The Debtor or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy

Code, regardless of whether the Debtor or Reorganized Debtor have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as applicable and as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

(10)   <u>Impact of Disputed Claims on Unsecured Claims Recovery</u>

The Debtor may seek one or more Final Orders of the Bankruptcy Court disallowing certain Claims. However, to protect the rights of Holders of such Disputed Claims, the Plan proposes to establish a Disputed Claims Reserve. The Debtor will seek to determine a maximum potentially allowable amount for all Disputed Claims, obtaining orders of the Bankruptcy Court where necessary to estimate or fix the maximum amount. It would be the Debtor's expectation that many of the Disputed Claims will be disallowed in whole or part, and that the funds placed in the Disputed Claims Reserve on their account will not be distributed to the Holders of such Claims and the funds reallocated to other uses.

(11)   <u>Maximum Distributions for Claims</u>

No Holder of a Claim will receive a recovery that is valued as of the Effective Date to exceed 100% of such Holder's Allowed Claim. Likewise, no Holder of a Claim shall receive a recovery that exceeds 100% of such Holder's Allowed Claim as of the Effective Date resulting from a decrease in the amount of Administrative Expense Claims, Priority Claims, Priority Tax Claims, and Secured Claims as determined on the Effective Date and/or an increase in the amount of Cash available to the Debtor to satisfy such Claims as determined on the Effective Date.

(12)   <u>Reservation of Rights Regarding Claims</u>

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of Setoff or recoupment. Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, the Debtor, or Reorganized Debtor may seek the appointment of a representation for the enforcement and prosecution of all such Claims.

**B.**    **<u>Disposition of Executory Contracts and Unexpired Leases</u>**

The Plan provides for the deemed assumption of all executory contracts or unexpired leases that have not been otherwise disposed of previously. Specifically, except as otherwise

provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtor will be deemed to have assumed each pre-petition executory contract and unexpired lease to which it is a party unless such contract or lease (a) was previously assumed or rejected upon motion by a Final Order, (b) previously expired or terminated pursuant to its own terms, or (c) is the subject of any pending motion, including a motion to assume, to assume on modified terms, to reject, or to make any other disposition filed by a Debtor on or before the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the assumptions of pre-petition executory contracts and unexpired leases described above, as of the Effective Date.

(1)      Rejection Damages Bar Date for Rejections Pursuant to Plan

If the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim will be forever barred and will not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel to the Reorganized Debtor within thirty (30) days after the notice of entry of the order authorizing the rejection of such executory contract or unexpired lease. The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease; any other Claims held by a party to a rejected contract or lease will have been evidenced by a Proof of Claim filed by earlier applicable bar dates or will be barred and unenforceable.

(2)      Cure with Respect to Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which any executory contract and unexpired lease to be assumed pursuant to the Plan is in default will be satisfied, under Section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure will occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided however, that the Reorganized Debtor will be authorized to reject any executory contract or unexpired lease to the extent the Reorganized Debtor, in the exercise of its sound business judgment, conclude that the amount of the Cure obligation, as determined by such Final Order, renders assumption of such executory contract or unexpired lease unfavorable to the Reorganized Debtor. **THE DEBTOR DOES NOT BELIEVE ANY CURE IS REQUIRED WITH RESPECT TO ANY EXECUTORY CONTRACTS OR LEASES THAT WILL BE ASSUMED.**

## C.      Revesting of Assets; Release of Liens

The property of the Debtor's Estate, together with any property of the Debtor that is not property of its Estate and that is not specifically disposed of or abandoned pursuant to the Plan, will revest in the Debtor on the Effective Date. Thereafter, the Reorganized Debtor may operate

its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all such property of the Reorganized Debtor will be free and clear of all Liens, Claims, and Equity Interests except as otherwise specifically provided under the Plan.

## IX. POST-CONSUMMATION CORPORATE STRUCTURE, MANAGEMENT, AND OPERATION, DISCHARGE INJUNCTIONS, AND RELEASES

### A. Continued Corporate Existence

The Plan provides that Debtor will remain in existence as a limited liability company in accordance with the applicable laws in the State of Florida.

### B. Post-Consummation Governance Documents

The governing corporate documents for the Debtor may be amended as necessary to include a provision prohibiting the issuance of non-voting equity securities to the extent required by Section 1123(a)(6) of the Bankruptcy Code.

### C. Officers and Directors of Reorganized Debtor

The Debtor currently anticipates that the Board of Directors (the "Board") of the Reorganized Debtor will consist of several of the same persons who served in such capacity prior to the Petition Date, to the extent such Members participate in the Exit Funding and receive new Equity Interests in the Reorganized Debtor as contemplated under the Plan. Specifically, the Debtor anticipates that Patricia Hubbard shall continue to serve in her existing capacities subsequent to the Effective Date, unless and until new officers are elected or appointed pursuant to the applicable governing documents and applicable laws.

### D. Corporate Action

On the Effective Date the appropriate officers or directors of the Reorganized Debtor will be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtor without the need for any required approvals, authorizations, or consents, except for express consents required under the Plan.

#### (1) Discharge and Discharge Injunction

Confirmation of the Plan effects a discharge of all Claims against the Debtor. As set forth in the Plan, except as otherwise provided therein or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or any of its assets or properties and, regardless of whether any property will have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtor will be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not

limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based upon such Debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) a Claim based upon such Debt is Allowed under Section 502 of the Bankruptcy Code, (iii) a Claim based upon such Debt is or has been Disallowed by order of the Bankruptcy Court, or (iv) the Holder of a Claim based upon such Debt accepted the Plan.

Under the Plan, as of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons will be precluded from asserting against the Debtor or the Reorganized Debtor, directly or indirectly, any other or further Claims, Debts, rights, causes of action, Claims for relief, liabilities, or Equity Interests relating to the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

In furtherance of the discharge of Claims, the Plan provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other Debt or liability that is discharged or an Equity Interest or other right of an Equity Security Holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, and their respective subsidiaries or their property on account of any such discharged Claims, Debts, or liabilities: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a Setoff, right of subrogation, or recoupment of any kind against any Debt, liability, or obligation due to the Debtor or the Reorganized Debtor; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

(2)     Conditional Release.

The Plan contemplates the conditional release of any claims the Debtor may have against IWA under certain circumstances. Specifically, Section 6.5 of the Plan provides that:

**IN THE EVENT THE PLAN IS, AND EXPRESSLY CONDITIONED UPON THE PLAN BEING, CONFIRMED PURSUANT TO SECTION 1129(a) OF THE BANKRUPTCY CODE WITH THE ACCEPTANCE OF THE PLAN BY THE AFFIRMATIVE VOTE(S) OF THE HOLDER OF THE IWA CLAIM WITH RESPECT TO ALL IMPAIRED CLASSES IN WHICH THE HOLDER OF THE IWA CLAIM IS OR MAY BE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, THEN IN CONSIDERATION OF THE HOLDER OF THE IWA CLAIM'S ACCEPTANCE OF THE PLAN AND WAIVER OF ANY**

DISTRIBUTION ON ACCOUNT OF THE IWA DEFICIENCY CLAIM, IF ANY, AS OF THE EFFECTIVE DATE, DEBTOR AND THE REORGANIZED DEBTOR WILL BE DEEMED TO HAVE FOREVER RELEASED, WAIVED, AND DISCHARGED IWA FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES (OTHER THAN THE RIGHTS OF DEBTOR OR REORGANIZED DEBTOR TO ENFORCE THE CHAPTER 11 PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER), WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE THAT ARE BASED IN WHOLE OR PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE, INCLUDING ACTIONS IN CONNECTION WITH INDEBTEDNESS FOR MONEY BORROWED BY DEBTOR, TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO DEBTOR, THE REORGANIZED DEBTOR, THE REORGANIZATION CASE, OR THE CHAPTER 11 PLAN

## X. PREFERENCES, FRAUDULENT CONVEYANCES AND OTHER CAUSES OF ACTIONS

Under the Plan, all Claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person ("Causes of Action") are retained by the Debtor after confirmation of the Plan (except to the extent such Claims are expressly released under the Plan). The Debtor may also elect, prior to confirmation, to pursue litigation against any Person (and/or any related guarantees) arising out of a debt to the Debtor. The Plan provides that except as otherwise provided in the Plan or the Confirmation Order, or in any contract instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, the Debtor or Reorganized Debtor will retain all of the respective Causes of Action that the Debtor or Reorganized Debtor may hold against any Person. The Debtor or Reorganized Debtor will retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Causes of Action. The Debtor or Reorganized Debtor or their respective successor(s) may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights in accordance with applicable law and consistent with the terms of the Plan.

Causes of Action include potential avoidance or other bankruptcy Causes of Action. Such Causes of Action may exist as a result of "preferential" payments or other transfers made by the Debtor on account of antecedent debts within ninety (90) days of the Petition Date, or one (1) year in the case of Insiders. The deadline for commencing preference actions is two (2) years

after the Petition Date. A decision with respect to whether to pursue such transfers will be made by the new Board prior to the expiration of that deadline. All Creditors and other parties who received potentially preferential payments are advised that such payments are subject to possible avoidance in proceedings to be commenced by the Reorganized Debtor. Alternatively, the Board may decide that the interests of the Reorganized Debtor would not be served by pursuing many such actions, as doing so could impair valuable relationships with continuing vendors and suppliers.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, Reorganized Debtor shall retain and have the exclusive right to enforce any and all causes of action and rights of the Debtor that arose both before and after the Petition Date ("Causes of Action"), including the rights and powers of a trustee and debtor-in-possession and all causes of action granted pursuant to and still existing under Sections 502, 544, 545, 547, 548, 549, 500, 551, and 553 of the Bankruptcy Code ("Avoidance Actions"), other than those expressly released, compromised, or assigned as part of or pursuant to the Plan. In addition, Causes of Action include non-bankruptcy Claims, rights of action, suits, or proceedings that arise in the ordinary course of the Debtor's business. The Debtor has not completed its analysis of available Avoidance Actions or the merits of any Causes of Action or Avoidance Actions.

If, as a result of the pursuit of any Causes of Action, a Claim would arise from a recovery pursuant to Section 550 of the Bankruptcy Code after Distributions under the Plan have commenced, making it impracticable to treat the Claim in accordance with the applicable provisions of the Plan, the Reorganized Debtor will be permitted to reduce the recovery by an amount that reflects the value of the treatment that would have been accorded to the Claim, thereby effectively treating the Claim through the reduction.

## XI. RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND ANY SUPPLEMENTS TO THIS DISCLOSURE STATEMENT) PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A. General Bankruptcy Risk Factors

(1) Parties In Interest May Object to the Debtor's Classification of Claims or Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, the Debtor cannot assure you that the Bankruptcy Court will reach the same conclusion.

Although the Debtor does not believe that implementation of the Plan will itself result in significant tax liability, the proposed transactions could potentially reduce any favorable tax attributes that the Debtor may otherwise be entitled to. The reduction of, and potential limitations on the Debtor's ability to use such favorable tax attributes could adversely affect the Reorganized Debtor's financial position in future years.

(3)    The Debtor May Not Be Able to Secure Confirmation of the Plan

The Debtor cannot assure that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, the Debtor cannot assure you that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of a Claim or Equity Interest might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any statutory requirements for confirmation had not been met.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization and that value of Distributions to non-accepting Holders of Claims and Equity Interests within a particular class under the plan will not be less than the value of Distributions such Holders would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan will not be followed by a need for further financial reorganization and that Holders within each Class under the Plan will receive Distributions at least as great as would be received following a liquidation under Chapter 7 of the Bankruptcy Code when taking into consideration all Administrative Expense Claims and the costs and uncertainty associated with any such Chapter 7 case.

## B.    Uncertainty of Projections

The Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtor's retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtor, and some or all of which may not materialize. The Projections are primarily based on "rolling forward" the Debtor's pre-confirmation balance sheet with adjustments made for the anticipated impact of the financial restructuring under the Plan. The Projections do not reflect possible additional adjustments that may be required and/or warranted under applicable laws, rules, or regulations such as those promulgated by the Internal Revenue Service or associated with Generally Accepted Accounting Principles.

To the extent that any assumptions are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor. Some or all of the assumptions may not be realized and that actual results may vary. Financial information contained in the Projections should not be regarded as a representation or warranty by the Debtor or any other Person that such projections can or will be achieved.

## XII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    General

The tax consequences of the Plan to the Debtor and to Holders of Claims and Equity Interests are discussed below. This discussion of the federal income tax consequences of the Plan under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "IRC" or "Tax Code"), is provided for informational purposes only. While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties. Moreover, the consequences to a Holder of Claims and Equity Interests may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of taxpayers holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holders' particular tax situations. In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**THE DEBTOR'S BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN. HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES.**

### B.    Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests

(1)    Consequences to Holders of Secured Claims.

The following discussion assumes that each Holder of an Allowed Secured Claim holds such Claim as a "capital asset" within the meaning of Section 1221 of the IRC. If an Allowed Secured Claim remains secured by a Lien on the Debtor's Assets, the Holder of such Claim should not recognize a gain or less except to the extent Collateral securing such Claim is changed, and the change in Collateral constitutes a "significant modification" of the Allowed Secured Claim within the meaning of Treasury Regulations promulgated under Section 1001 of the IRC. If an Allowed Secured Claim is paid in full in Cash, the Holder should recognize a capital gain or loss (which capital gain or loss would be a long-term capital gain or loss to the

extent that the Holder has held the debt instrument underlying its Claim for more than one (1) year) in an amount equal to the amount of Cash received over the Holder's adjusted basis in the debt instrument(s) underlying its Allowed Secured Claim. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

(2)      Consequences to Holders of Priority Claims.

To the extent that the Holder of an Allowed Priority Claim receives a Distribution under the Plan, such Holder should recognize such Distribution as ordinary income and submit the appropriate withholdings based on that Holder's particular circumstances. The Reorganized Debtor shall make any appropriate withholdings from such Distributions.

(3)      Consequences to Holders of Unsecured Claims.

To the extent the Holder of an Allowed General Unsecured Claim receives less than full payment on account of such Claim, the Holder of such Claim may be entitled to assert a bad debt deduction or worthless security deduction with respect to such Allowed Unsecured Claim.

To the extent that any amount received by a Holder of an Allowed Unsecured Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of an Allowed Unsecured Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtor. Such loss may be ordinary, but the tax law is unclear on this point.

(4)      Consequences to Holders of Equity Interests.

Hubbard is recognized as a "pass through" entity under the IRC. As such, the tax consequences of Hubbard's generation of a profit or loss in a given year generally "pass through" to Hubbard's Equity Holders. The allocations of the profits and losses are generally governed by the ownership allocation of the company. As such, the tax consequences of the Plan will vary depending on the specific circumstances of each Equity Holder.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor**

Because Hubbard is a limited liability company, it is a "pass through" entity. As such, the Plan will have relatively few direct federal income tax consequences to Hubbard. Instead, these tax consequences must be analyzed at the Equity Holder's level, as discussed above.

**D.      Backup Withholding and Reporting**

The Reorganized Debtor will withhold all amounts required by law to be withheld from payments subject to federal taxes, if any, and will comply with all applicable reporting requirements of the IRC.

## E.   IRS Circular 230 Notice

Any tax advice contained in this Disclosure Statement (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the IRC or (ii) promoting, marketing, or recommending to another party any tax-related matter addressed herein.

## XIII.   FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.   Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

In determining the feasibility of the Plan, the Debtor has relied upon the Projections attached to this Disclosure Statement as **Composite Exhibit "C."**  The Projections indicate that the Reorganized Debtor should have adequate cash flow to pay and service its debt obligations and to fund its operations.  Accordingly, the Debtor believes that the Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code.

The Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other Claims; and other matters, many of which will be beyond the control or knowledge of the Debtor and some or all of which may not materialize.

The Debtor intends to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising or information obtained after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events.

### B.   Liquidation Analysis

Even if a plan is accepted by each class of creditors and equity security holders, in order to confirm a plan of reorganization, the Bankruptcy Court must independently determine that the plan is in the best interests of all classes of creditors and equity security holders impaired by the plan.  The "best interests" test requires that the Bankruptcy Court find either that all members of an impaired class of claims or equity interests have accepted the plan or that the plan will provide such member a recovery that has a value at least equal to the value of the distribution that each such member would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate what members of each impaired class of creditors and equity security holders would receive if a debtor were liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of the collateral and, then, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and its Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in this Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are Allowed in the Chapter 7 case, litigation costs and claims arising from the operations of the debtor during the pendency of the Chapter 11 case. The liquidation itself could trigger certain priority claims, such as claims for severance pay, and could accelerate other priority payments that otherwise would be due in the ordinary course of business, such as litigation costs and claims arising from the wind-down of the debtor's operations during the Chapter 7 case. Those administrative and priority claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay general claims or to make any Distribution in respect of Equity Interests.

The Debtor believe that a Chapter 7 liquidation would result in recoveries substantially less than the recoveries expected to be received pursuant to the Plan and that these reduced recoveries would be received at a much later time. Additional administrative expenses would result from the appointment of a trustee or trustees and corresponding professionals. Furthermore, the Debtor believes that substantial additional Claims would result from cessation of its operations.

Attached hereto as **Exhibit "D"** is the Liquidation Analysis for the Debtor assuming a hypothetical Chapter 7 liquidation in which a court-appointed trustee liquidates the company's assets pursuant to an orderly liquidation.

The Liquidation Analysis is based on a number of estimates and assumptions which, while considered reasonable, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor or any Chapter 7 trustee. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtor were, in fact, to undergo such a Chapter 7 liquidation, and actual results could vary materially from those shown here. In addition, any liquidation would necessarily take place in the future under circumstances which presently cannot be predicted. Accordingly, if the Debtor's estate was in fact liquidated, the actual liquidation proceeds could be materially lower or higher than the amounts set forth below and no representation or warranty can be or is being made with respect to the actual proceeds that could be received in a Chapter 7 liquidation.

## XIV.  SUMMARY, RECOMMENDATION, AND CONCLUSION

The Plan provides for an orderly and prompt Distribution to Holders of Allowed Claims and the satisfaction of all asserted Claims and Equity Interests.  In the opinion of the Debtor, the Plan provides for a larger Distribution to the Debtor's Creditors than would otherwise result in liquidation under Chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller Distributions to Holders of Allowed Claims than proposed under the Plan.

***Accordingly, the Debtor recommends that Holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan***.

Dated: November 15, 2011

HUBBARD PROPERTIES, LLC.

By:  ___*/s/ Patricia Hubbard*_____
        Patricia Hubbard, Managing Member